227 N.J. Super. 504 (1988)
547 A.2d 1167
WESTINGHOUSE ELECTRIC CORP., PLAINTIFF,
v.
AETNA CASUALTY & SURETY COMPANY, ET AL., DEFENDANTS.
WESTINGHOUSE ELECTRIC CORP., PLAINTIFF,
v.
LIBERTY MUTUAL INSURANCE COMPANY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided March 22, 1988.
*505 Peter Kalis, for plaintiff (Kirkpatrick & Lockhart, Attorneys)
Robert Chesler, for plaintiff (Lowenstein, Sandler, Kohl, Fisher & Boylan, Attorneys)
John Sullivan, for defendant Liberty Mutual Insurance Company (Manta & Welge, Attorneys)
Timothy C. Russell, for defendant, Lumbermens Mutual Casualty Company (Drinker, Biddle & Reath, Attorneys)
James A. Houlihan, for defendant, Hartford Accident and Indemnity Company (Hogan & Hartson, Attorneys)
G.M. Moriarty, for defendant, London Property Insurers (Ropes & Gray, Attorneys)
Mitchell L. Lathrop, for defendant, Puritan Insurance Company (Adams, Duque & Hazeltine, Attorneys)
LAWRENCE WEISS, J.S.C.
These declaratory judgment actions have been consolidated for the purpose of deciding the motion for dismissal on the basis of forum non conveniens.

*506 FACTS

Westinghouse v. Liberty Mutual Insurance Company, et al, Docket No. L-069352-87.
This suit is against 140 plus insurance carriers who are alleged to have provided primary and excess coverage for property damage to Westinghouse from 1948 to the present. There are presently 33 attorneys representing the various carriers.
Westinghouse is seeking a declaration of coverage for 81 environmental sites, located in 23 states from California to Massachusetts. Presently there are nine suits pending against Westinghouse involving alleged contamination of waste sites. None of these suits are in New Jersey. Fifty-six of the sites are "non-owned" and Westinghouse is alleged to be one of the generators of toxic waste material on these sites rather than the owner. Nine of the 81 sites are located in New Jersey.

Westinghouse v. Aetna Casualty & Surety Co., et al., Docket No. L-069351-87.
This suit is a declaratory judgment action to determine the rights and obligations of Westinghouse and more than 100 liability carriers who provide Westinghouse with primary and excess coverage under Comprehensive General Liability policies from 1948 to the present. Westinghouse seeks a determination of its insurers' obligations with respect to past and future liabilities of Westinghouse arising out of various toxic exposure claims. The suit focuses principally on welding rod, PCB and asbestos-related claims. New Jersey's connection to Westinghouse asbestos matters is extremely limited. According to the information supplied by Westinghouse, it has been involved in 2,675 asbestos-related matters. Only 128 claims, less than five percent of the total, were filed in New Jersey.
An analysis of the PCB-related matters again reveals no connection with New Jersey. There are approximately 201 PCB-related matters which are at issue in this litigation and not one of these cases was filed in New Jersey.
*507 The information supplied by Westinghouse reveals that it has been involved in 138 welding rod-related matters. Not one of these matters was filed in New Jersey.
Finally, Westinghouse seeks a declaration of its carriers' obligations with respect to a miscellaneous group of other toxic exposure matters. Westinghouse has identified 18 matters which fall within this classification and only one of these matters involves litigation filed in New Jersey.

JURISDICTION
Westinghouse is incorporated and has its principal place of business in Pennsylvania. Thermo King is a Delaware corporation with its principal place of business in Minnesota. However, Westinghouse's presence in New Jersey is significant. It employs over 1,000 people in this State and paid more than $1.5 million in taxes to state and local governments in 1986. Westinghouse owns over 250 acres of property in this State, including its elevator division in Morristown and its apparatus service center in Hillside.
The defendant insurance companies are either incorporated in this state, authorized to conduct business in this state, or have expressly submitted to any forum chosen by Westinghouse to litigate insurance contract disputes.
Clearly there can be no dispute that New Jersey possesses jurisdiction over each of the defendants. The real question is whether New Jersey is the proper forum to decide these particular complaints.
In recent years there has been an enormous increase of toxic site pollution problems as well as personal injury claims arising out of exposure to asbestos and other toxic materials. It has been estimated that "more than 30,000 asbestos-related personal injury claims were filed nationwide by 1986, and an additional 180,000 claims are projected to be on court dockets by the year 2010." In re School Asbestos Litigation, 789 F.2d 996, 1000 (3rd Cir.1986).
*508 The Environmental Protection Agency projects that super-fund cleanup could eventually involve as many as 22,000 waste sites throughout the nation. Business and the Law; Suits Mounting on Toxic Waste, N.Y. Times, February 15, 1988, at D2, col. 1.
Because of New Jersey's favorable economic structure, many chemical companies and manufacturers of toxic materials are located here or have used this State's land as toxic waste disposal sites. Our courts have already been faced with determining coverage questions on sites located in this State. See Broadwell Realty v. Fidelity Casualty, 218 N.J. Super. 516 (App.Div. 1987); Jackson Township, etc. v. Hartford Acc. Indemn. Co., 186 N.J. Super. 156 (Law Div. 1982). The courts can anticipate many declaratory judgment actions in the future.
The doctrine of forum non conveniens is a procedural device used by defendants to avoid the sometimes harsh consequences of being compelled to litigate in an inconvenient forum. The New Jersey Supreme Court has defined the doctrine in Civic Southern Factors v. Bonat, 65 N.J. 329, 332-333 (1974) where it states: "The doctrine of forum non conveniens, an equitable principle, is firmly imbedded in the common law of this State. Starr v. Berry, 25 N.J. 573 (1958); Vargas v. A.H. Bull Steamship Co., 25 N.J. 293 (1957) cert. den., 355 U.S. 958, 78 S.Ct. 545, 2 L.Ed.2d 534 (1958); Gore v. United States Steel Corp., 15 N.J. 301 (1954), cert. den. 348 U.S. 861, 75 S.Ct. 84, 99 L.Ed. 678 (1954). In essence, the doctrine means that a court may decline jurisdiction whenever the ends of justice indicate that trial in the forum selected by the plaintiff would be inappropriate."
A plaintiff's choice of forum is presumed to be valid. A defendant is required to overcome this presumption in order to successfully invoke the doctrine. Defendant must show "hardship ... or any other compelling reason for depriving plaintiffs of their choice of forum." Radigan v. Innisbrook Resort and Golf Club, 150 N.J. Super. 427, 431 (App.Div. 1977). *509 The United States Supreme Court has stated "unless the balance is strongly in favor of the defendants, the plaintiff's choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). Any analysis of the doctrine must, therefore, begin with the premise that the forum chosen by a plaintiff is a proper one. The application of the doctrine presupposes the existence of an alternative forum in which a defendant can properly be served with process. Id.
The policies underlying both these actions were negotiated primarily in Westinghouse's Pittsburgh and Boston offices.
It is abundantly clear that any state wherein Westinghouse is a potential party to a suit for damages arising out of a claim for property damage or personal injury from toxic materials is an alternative forum. Also, Pennsylvania where the contracts for insurance were negotiated is an alternative forum.
Application of the forum non conveniens doctrine requires the weighing of a number of factors. In Gore v. United States Steel Corp., 15 N.J. 301, cert. den. 348 U.S. 861, 75 S.Ct. 84, 99 L.Ed. 678 (1954), the Supreme Court of New Jersey, quoting extensively from the seminal decision of the United States Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), set out the major considerations underlying the application of the doctrine, as follows:
Important considerations are the relative ease of access to sources of proof; the availability of compulsory process for the attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility [sic] of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex", "harass", or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

*510 Factors of public interest also have a place in applying the doctrine. Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not be imposed upon people of a community which has no relation to the litigation. In many cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by reports only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.
The New Jersey Supreme Court has ruled that the trial court should evaluate these "private" and public interests in its analysis of forum non conveniens. In Semanishin v. Metropolitan Life Ins. Co., 46 N.J. 531, 533 (1966) the court stated:
Under the doctrine of forum non conveniens a court may decline jurisdiction whenever the ends of justice indicate that a trial in a forum selected by the plaintiff would be inappropriate. (Cites omitted.) Although the doctrine is frequently invoked to protect the private interests of litigants (taking into consideration such factors as availability of witnesses, the ease of access to other sources of proof, etc.), see e.g., Gore v. United States Steel Corp., supra, the doctrine should also be applied to protect the citizens of a state from the unjustifiable burden imposed upon them when controversies having no connection with the state are allowed to proceed to trial. Paxton Blair in his classic exposition of the doctrine of forum non conveniens has said: `Calendars become congested, and local taxpayers suffer unjustly from the burden contributing to the expense of trying imported controversies.' Blair, "The Doctrine of Forum Non Conveniens," 29 Colum.L.Rev. 1, 34 (1929).
The following is the court's analysis of these factors in order to make its ultimate decision.

PRIVATE INTEREST
The first consideration discussed by the Gore court for determining the appropriateness of a particular court as the forum for a resolution of a controversy is the "relative ease of access to sources of proof." In this matter, one of the principal sources of discovery and trial evidence will be evidence concerning the waste sites and toxic chemical claims against Westinghouse. With the exception of evidence concerning the small proportion of New Jersey sites and claimants, this evidence will *511 be located almost entirely outside this State. New Jersey has only an extremely limited nexus with the events which form the basis of this lawsuit, inasmuch as the vast majority of sites and claimants are outside the State.
This court is required to conduct a site-by-site analysis of the evidence on most coverage questions. In CPS Chem. Co. v. Continental Ins. Co., 203 N.J. Super. 15 (App.Div. 1985), CPS sought a declaration that its liability carriers were obligated to defend and indemnify it in a clean-up suit brought by the City of Philadelphia. The city alleged that CPS and three other defendants generated toxic wastes that were illegally deposited in one city-owned garbage dump, and caused damage to the environment. The trial court granted partial summary judgment in favor of the insured, declaring that the carriers had a duty as a matter of law to defend the claim under the liability policies.
On appeal, the trial court decision was reversed. In focusing on the existence of unresolved issues concerning the nature of the City's claims and their impact on the allegations of coverage, the court stated: "Not only is there a serious question about the nature of the claim, i.e., whether the plaintiff's conduct was intentional or inadvertent, but there is also a serious question of when the damage occurred during the respective policy periods." Id., at 20. Accordingly, the Appellate Division remanded the case for further proceedings.
The requirement of a site-by-site analysis has been re-emphasized in subsequent decisions of the Appellate Division. In Solvents Recovery Serv. of New England, Inc. vs. Midland Ins. Co., No. A 555-84T5 (N.J. Super., App.Div. February 15, 1985), the Appellate Division reversed the trial court's granting of a summary judgment concerning the applicability of the pollution exclusion. In vacating Judge Lechner's order and remanding the case for a plenary hearing, the court stated as follows:
The case presented is one where, for the purposes of the New Hampshire action, the question of plaintiff's intent or whether it knew or should have *512 known its conduct would cause pollution are probably immaterial but this is not so as to the question of applicability of exclusion (f). The latter question is one which, in the present circumstances, does not readily lend itself to summary judgment and the motion should have been denied. Slip op. at 2.
In Broadwell Realty Services, Inc. v. Fidelity & Casualty Co., 218 N.J. Super. 516 (App.Div. 1987) the court considered the application of two policy provisions relevant here: the pollution exclusion and the "owned property" exclusion. Both issues had been resolved by the trial court on a summary judgment motion. The Appellate Division reversed the granting of a summary judgment and remanded the case for plenary hearing on both issues.
As a result it is clear that testimony will have to be taken from environmental regulatory and enforcement officials from all of the 23 states involved. Moreover, volumes of documents from such out-of-state sources will eventually have to be examined with respect to the same issues.
Similar difficulties will be experienced if this court decides to retain jurisdiction over the entire Westinghouse v. Aetna case. Courts applying New Jersey law have recognized the need to examine the particular mechanism of injury by a toxic substance in order to determine when bodily injury occurs for insureds' purposes. See, e.g., Hartford Accident and Indemn. Co. v. Aetna Life & Casualty Ins. Co., 98 N.J. 18, 28 (1984) (refusing to apply asbestos coverage approach automatically because of the absence of medical evidence concerning the impact of the insured's drug on the body.). Sandoz, Inc. v. Employer's Liab. Assurance Corp., 554 F. Supp. 257, 265 (D.N.J. 1983) (rejecting asbestos coverage approach where no medical basis was established for equating effect of asbestos exposure with effect of injestion of insured's drugs.)
Courts in other jurisdictions have also insisted on such a fact-specific approach in the toxic chemical bodily injury context. See, e.g., Insurance Co. of North America v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir.1980), modified, 657 F.2d 814, cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 *513 L.Ed.2d 650 (1981); American Home Prod. Corp. v. Liberty Mutual Insurance Co., 748 F.2d 760 (2d Cir.1984). As a result, if this court retains jurisdiction over the cases as filed, it would be required to analyze medical evidence concerning the impact on the body of asbestos, PCB and welding rod fumes, even though no claims relating to the exposure of the latter two substances are pending in New Jersey and less than five percent of the 2,675 claims relating to asbestos are in this state. If New Jersey were to retain jurisdiction, most of the witnesses will be out of state and clearly not subject to compulsory process. In Civic Southern Factors, supra, 65 N.J. at 334-335, the Supreme Court stated "difficulty of access to proof and availability of compulsory process for attendance of unwilling witnesses are important considerations."
The court is aware of the increased use of deposition testimony; "... to fix a place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on depositions, is to create a condition not satisfactory to court, jury or most litigants." Vargus v. A.H. Bull Steamship Co., 44 N.J. Super. 536, 552 (App.Div. 1957).
Assuming that all necessary out-of-state witnesses would voluntarily submit to this court's jurisdiction (i.e., employees of out-of-state regulatory agencies, as well as current and former "non-New Jersey" entities involved with the 72 waste sites and the 22 other states) it can be anticipated that many witnesses will be required to testify. Each witness will have to be reimbursed for lodging, meals and travel expenses. The expenses associated with bringing in almost all of the witnesses from out-of-state would be enormous. At this juncture of the litigation, it is impossible to determine the exact number of witnesses whose testimony will be necessary to fully adjudicate these issues. However, as previously set forth, this court will be required to examine the evidence on a site-by-site basis. See CPS Chemical Co. v. Continental Ins. Co., supra.

*514 PUBLIC INTEREST
In determining the appropriateness of a particular jurisdiction, this court must look not only to the private interest factors discussed above, but also to the public interest considerations.

Administrative Difficulties.
In addition to the private interest considerations, courts, in determining forum non conveniens motions also look to the administrative costs and other burdens which would be imposed on the court if the plaintiff's choice of forum were to prevail.
In Semanishin v. Metropolitan Life Ins. Co., 46 N.J. 531, 533 (1966) the Supreme Court of New Jersey recognized that the doctrine of forum non conveniens is properly applied "to protect the citizens of a state from the unjustifiable burden imposed upon them when controversies having no connection with the state are allowed to proceed to trial." The court stated, "Calendars become congested, and local taxpayers suffer unjustly from the burden of contributing to the expense of trying imported controversies." Id. at 534-35. (quoting Blair, "The Doctrine of Forum Non Conveniens", 29 Colum.L.Rev. 1, 34 (1929)).
The expense in time and money to litigate the cases sub judice are incapable of calculation at this time, but some measure of the magnitude of the cost can be seen from a comparison of other "mega trials." See Boston Sunday Globe, California Mega Trial Heralds a Legal Trend, Boston Sunday Globe, November 9, 1987. The article discussed the Shell Oil Co. v. Accident and Casualty Insurance Co., et al, litigation.
Shell contended that the defendant should pay clean-up costs for toxic spills at sites in two states, Colorado and California. The various defendants were represented by 40 law firms. To accommodate the litigants, a former high school building was renovated and turned into a huge court facility which included a courtroom, law library, jury deliberation room, offices for the judge, clerk and court reporters. Although the case is still in *515 its early stages of trial, more than four thousand exhibits and seven thousand pleadings have been filed and a computerized system has been established to handle this volume.
Present estimates for construction and staffing costs total approximately $550,000. The true estimate of this first jury trial of "mega-type" litigation is impossible to calculate.
The article also discussed In re California Asbestos Ins. Coverage Cases, No. 1072, Judicial Counsel Coordination-Proceeding. In that case five asbestos manufacturers were suing 70 of their insurance companies for coverage. The huge expenditure of monies and time are set forth in both defendant Liberty Mutual Insurance Company's brief at Pages 18-19, and defendant Lumbermens Mutual Insurance Company's brief at Pages 23 and 24, which facts have not been disputed by the plaintiff. Defendants, in their briefs, state that the case has been pending for eight years and there has already been a total of 183 trial days from September 18, 1985 to February 20, 1987 for a determination of the trigger and scope of coverage for asbestos-related bodily injury claims. Estimated costs for this non-jury trial are approximately $500,000 to $750,000 plus the necessity of hiring one additional full-time judge and one discovery referee, plus renovating another building to house the trial.
It is clear that the two matters before the court are equal, if not greater, in terms of complexity than the California case. Westinghouse seeks not only a determination of the trigger of coverage for asbestos bodily injury claims but also for welding rod matters, PCB matters and other toxic exposure matters as well as coverage issues relating to hazardous waste sites located at 23 different states.
With respect to the hazardous waste claims only, this court will be faced with complex issues which have resulted in extensive litigation on the following questions: the applicability of the pollution exclusion, the question of whether the insured's conduct constituted an occurrence, the question of whether clean-up costs constituted property damage, the applicability of *516 the property damage, the applicability of the property owned exclusion, the question of non-disclosure of material risk in applying for the coverage, and the date on which bodily injury and property damage, if any, will be deemed to have taken place.
Any court forced to administer and resolve cases of this size, involving numerous waste sites of which 71 are not in New Jersey, thousands of toxic injury claims, of which 95 percent do not arise in New Jersey, large number of witnesses and sources of documentary proof spread around the country and a multiplicity of potential applicable laws, will be faced with a formidable administrative puzzle and the expenditure of great sums of taxpayers' dollars.
In fact, the adjudication of the coverage issues relating to the nine New Jersey hazardous waste sites at issue in Westinghouse v. Liberty Mutual and the 128 personal injury claims in Westinghouse v. Aetna will fully occupy this court's resources for quite some time. The burden placed on this court will be overwhelming if it were also required to be responsible for issues relating to matters outside this state. Retention of jurisdiction will also impede the ability of the citizens of Union County to have their own claims litigated in their home forum in an expeditious manner. These administrative considerations and financial burdens must be considered in the overall weighing of the public factors in deciding this motion.
The plaintiffs have demanded a jury trial in each of these actions. The courts have long recognized a policy of not imposing jury duty "upon the people of a community which has no relation to the litigation" in order to avoid "squandering jury service on imported controversies." Gulf Oil Co., supra, at 508-509, 67 S.Ct. at 843.
Moreover, the overwhelming majority of the jury's time will be spent hearing evidence on issues of no conceivable interest to New Jersey. In Westinghouse v. Liberty Mutual, a jury made up of citizens of Union County will be required to hear evidence concerning insurance coverage for various personal *517 injury claims against Westinghouse even though less than five percent of the claims deal with New Jersey claimants. There seems little justification for asking a Union County citizen to expend the enormous amount of time and energy to decide controversies arising outside the borders of this state.
Gore, supra, 15 N.J. at 307, requires consideration of the public interest factor of whether the forum state will apply its law or that of a sister state. The United States Supreme Court emphasized the importance of this factor in Piper Aircraft Co. v. Reyno, 454 U.S. 235, 251, 102 S.Ct. 252, 263, 70 L.Ed.2d 419 (1981), stating that the doctrine of forum non conveniens "is designed in part to help courts avoid conducting complex exercises in comparative law."
In State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28 (1980), the Supreme Court announced the New Jersey rule governing choice-of-law in insurance contract disputes, stating that:
The law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issues dictates that this basic rule should yield. Id. at 37.
See also, Buzzone v. Hartford Accident Indemnity Co., 23 N.J. 447 (1957); Lewandowski v. National Grange Mutual Ins. Co., 149 N.J. Super. 591 (Law Div. 1977).
Although the court need not decide the choice-of-law issue at this time, it must recognize in some instances New Jersey has applied its own law to out-of-state issues because of this state's dominant and significant relationship to the party or issue. Bernick v. Frost, 210 N.J. Super. 397 (App.Div. 1986), (attorney-client fee arrangement construed under New Jersey law) Huffmaster v. Robinson, 221 N.J. Super. 315 (Law Div. 1986), (New Jersey Consumer Fraud Act applied to repair contract made in Pennsylvania), Witco Corp. v. Travelers Indemnity Co., No. 80-2997 (U.S.D.C.N.J. May 1, 1987) [available on WESTLAW, 1987 WL 49361] (New Jersey law applied to toxic waste site because of this State's dominant interest in protecting its citizens).
*518 There is significant reason to believe that each state where a toxic exposure case arose has a dominant interest in applying its own law to all coverage questions.

CONCLUSION
Recognizing that the courts must presume that the plaintiff's choice of forum is a valid one, after reviewing the factors previously set forth, the court must come to the inescapable result that New Jersey should not retain jurisdiction over any of the claims not within the confines of the State of New Jersey. The availability of another more appropriate forum will better serve the ends of justice and the convenience of the parties and the court.
This court in Westinghouse v. Liberty Mutual Insurance Co. grants a dismissal as to all questions involving 71 environmental sites not located in this state. The court retains jurisdiction of the nine sites located in the State of New Jersey.
In the Westinghouse v. Aetna Casualty Insurance Co., case, this court retains jurisdiction over the 128 claims which were filed in New Jersey and as to the remaining matters, this court grants a dismissal on the grounds of forum non conveniens.