233 N.J. Super. 463 (1989)
559 A.2d 435
WESTINGHOUSE ELECTRIC CORPORATION AND THERMO KING CORPORATION, CORPORATIONS, PLAINTIFFS-APPELLANTS,
v.
LIBERTY MUTUAL INSURANCE COMPANY, ET AL., DEFENDANTS-RESPONDENTS.
WESTINGHOUSE ELECTRIC CORPORATION, A CORPORATION, PLAINTIFF-APPELLANT,
v.
THE AETNA CASUALTY AND SURETY COMPANY, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Decided May 15, 1989.
*464 Before Judges PRESSLER, O'BRIEN and STERN.
Peter J. Kalis argued the cause for appellants Westinghouse Elec. Corp. and Thermo King Corp. (A-4553-87T1F and A-4554-87T1F) (Kirkpatrick & Lockhart and Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Peter J. Kalis, Donald E. Seymour, Lorraine A. Mansour, Thomas M. Reiter, Robert D. Chesler and Michael L. Rodburg, on the brief).
Timothy C. Russell argued the cause for respondent Lumbermens Mut. Cas. Co. (A-4553-87T1F and A-4554-87T1F) (Drinker Biddle & Reath and Sellar, Richardson, Stuart & Chisholm; Timothy C. Russell, Glenn A. Harris, James M. Sweet, James P. Richardson and Wendy H. Smith, on the brief).
Mitchell L. Lathrop argued the cause for respondent Puritan Ins. Co. (A-4553-87T1F and A-4554-87T1F) (Adams, Dugue & Hazeltine, attorneys; Mitchell L. Lathrop, Kimball Ann Lane, Cathy L. Carver and James E. Fitzgerald, joined in the brief of Lumbermens Mut. Cas. Co. in A-4553-87T1F & A-4554-87T1F).
Joseph G. Manta argued the cause for respondent Liberty Mut. Ins. Co. (A-4553-87T1F & A-4554-87T1F) (Manta and Welge, attorneys; Joseph G. Manta and Dorothy E. Carl, of counsel; John C. Sullivan and Mary E. Rugala, on the brief).
*465 Sheft, Wright & Sweeney, attorneys for respondents AIU Ins. Co.; Granite State Ins. Co.; The Ins. Co. of the State of Pa.; Landmark Ins. Co.; Lexington Ins. Co.; Nat. Union Fire Ins. Co. of Pittsburgh, Pa.; American Centennial Ins. Co.; Allianz Ins. Co.; Allianz Underwriters Ins. Co.; American Home Assurance Co. (A-4553-87T1F & A-4554-87T1F), join in the brief of Lumbermens Mut. Cas. Co. in A-4553-87T1F & A-4554-87T1F (Peter I. Sheft and Robin L. Yeager, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Plaintiff Westinghouse Electric Corporation appeals, on leave granted, from an order of the Law Division severing a substantial portion of its comprehensive declaratory judgment actions against its liability and property damage insurers and dismissing, on forum non conveniens grounds, all claims for coverage made by it arising out of events which occurred outside of the State of New Jersey. We reverse.
Plaintiff Westinghouse Electric Corporation,[1] a multi-dimensional industrial giant doing business both throughout the United States and abroad, brought two declaratory judgment actions in the Superior Court, Law Division, against the 144 insurers, both American and Foreign, who participated between 1948 and 1982 in providing it, through some 300 policies issued by primary and excess carriers, with an integrated, comprehensive liability and property-damage insurance program covering the risks of its business operations, wherever conducted. Some two hundred million dollars of coverage is involved. There is *466 no question of the court's in personam jurisdiction over all parties.
In Westinghouse v. Aetna Casualty & Surety Co., et al., the so-called toxic tort case, plaintiff seeks a declaration of coverage under its comprehensive general liability policies for some 3,000 claims made against it by persons asserting that they have sustained injury as a result of exposure to asbestos, welding fumes, polychlorinated biphenyls (PCBs), and other substances for which Westinghouse is alleged to be responsible. Of these claims, 128 have been filed in New Jersey. In Westinghouse v. Liberty Mutual Insurance Company, et al., the so-called environmental-claims case, plaintiff seeks coverage both from its liability carriers and its property damage carriers for losses it has sustained or may sustain arising out of industrial activities which are alleged by federal and state environmental control agencies and by private entities to have resulted in both on- and off-site environmental contamination. These claims encompass 81 sites located in 23 states. Of these sites, 56 are non-owned and generally involve disposal thereon of waste generated by plaintiff's industrial activities conducted on the remaining sites. Nine of the 81 sites, including two owned sites and seven non-owned sites, are located in New Jersey. All 144 defendant insurers have disclaimed.
The actions are still in their most preliminary stage, and insofar as we can determine from this record, no substantive rulings have yet been made. The focus of the litigation is still on its scope, and that is the issue which now engages us. In sum, the issue is whether there will be a single comprehensive trial of the coverage question or whether Westinghouse will be forced to litigate the coverage question repeatedly in every state of the union in which a toxic tort claim or an environmental claim has been made against it.
Westinghouse and a group of 89 defendants, identified as the *467 Liberty Mutual Group,[2] take the position that a single comprehensive coverage action is mandated in the circumstances here. The threshold dispute between plaintiff and these defendants involves only the question of the forum in which this comprehensive litigation should be conducted, whether the Superior Court of New Jersey or the Federal District Court for the Western District of Pennsylvania, an alternative we will address in greater detail hereafter. The so-called Lumbermens group, consisting of about 14 insurers,[3] takes the position that the coverage question must be separately litigated in each state in which a claim against Westinghouse is made, and Lumbermens, to demonstrate its point, instituted, after the filing of these actions, reactive actions in South Carolina, North Carolina, Ohio, California, Louisiana and Virginia seeking a no-coverage declaration against Westinghouse. These have since been stayed. As we understand the record, the remaining defendants take no scope position.
The trial judge consolidated the two cases for purposes of the scope determination and, in an opinion reported at 227 N.J. Super. 504 (Law Div. 1988), concluded that the doctrine of forum non conveniens requires the limitation of the coverage action to the claims made by Westinghouse against its insurers which arise out of New Jersey sites and New Jersey toxic torts suits.
*468 We note preliminarily that although we disagree with the trial judge's view of the matter and although we conclude that the forum non conveniens doctrine is inapposite, at least at this early stage of the litigation, we nevertheless recognize that the litigation as presently postured is inordinately complex and that its conduct will pose formidable procedural problems which will surely challenge the outer limits of judicial case management as presently practiced. We are nevertheless convinced that the trial courts of this state have available to them both the basic techniques and the judicial skill in implementing them which are necessary for successfully and expeditiously managing a case of these proportions consistently with the administration of justice both for the litigants and for the judicial system as a whole. Our fundamental perception is that the trial judge resorted to the forum non conveniens theory as a case management technique. We believe, however, that cases, even cases as difficult and cumbersome as this one, cannot be "managed" by the simple expedient of dismissing them or parts of them. We must, as a judicial system, devote our efforts to determining how best to adjudicate controversies on their merits, not how to avoid adjudication. Westinghouse, it is true, is not a New Jersey corporation. It is incorporated and has its principal office in Pittsburgh, Pennsylvania. Nevertheless, as the trial judge pointed out, its
presence in New Jersey is significant. It employs over 1,000 people in this State and paid more than $1.5 million in taxes to state and local governments in 1986. Westinghouse owns over 250 acres of property in this State, including its elevator division in Morristown and its apparatus service center in Hillside. [227 N.J. Super. at 507]
There can be no doubt that the economic prosperity we enjoy in this State is in large measure attributable to major national corporations which, like Westinghouse, are incorporated elsewhere but engage in substantial business activity here, employ our residents, and contribute to our tax base. There is no question that they are entitled, as are all our citizens, to as full an access to our court system as is consistent with fundamental principles of acquiring and exercising jurisdiction.
*469 It is with this essential proposition in mind that we consider the scope issues before us. First, with respect to forum non conveniens, we note initially that it is an equitable doctrine of long standing predicated upon the basic notion that if more than one forum is available for the conduct of particular litigation, the court of the forum of plaintiff's choice has the discretion to require the litigation to be conducted in the other forum if the plaintiff's chosen forum is demonstrably inappropriate, that is, if a "clear showing of real hardship or * * * compelling reason" is made. Civic Southern Factors v. Bonat, 65 N.J. 329, 333 (1974). The determination of whether the objector to plaintiff's choice of forum has succeeded in meeting this demanding standard ordinarily requires the weighing of both private interest factors, that is, the considerations affecting the parties themselves in the litigation context, and public interest factors, that is, the considerations affecting the administration of the court system. These include such matters as location of witnesses, accessibility of proofs, the relative state of calendar congestion, and the strength of the local-interest nexus as mandating or not the undertaking of the litigation burden. See generally D'Agostino v. Johnson & Johnson, Inc., 225 N.J. Super. 250 (App.Div. 1988), certif. granted 113 N.J. 369 (1988). In customary forum non conveniens terms then, the inquiry focuses upon the comparative appropriateness of several forums and the ultimate determination is the manifest inappropriateness, or not, of plaintiff's choice among them.
That, of course, is not the context in which the forum non conveniens doctrine was applied here. The issue was not dealt with in terms of whether there was an alternate and manifestly more appropriate forum for this litigation as plaintiff framed it. Rather, the court undertook to decide, in the name of forum non conveniens, whether plaintiff should be allowed, at least in this jurisdiction, to conduct a comprehensive action in order to obtain a single, comprehensive, definitive adjudication of its rights under a comprehensive and definitive set of insurance contracts, or whether it would be consigned to multiple adjudication *470 of the same issue throughout the country. In our view, resort to forum non conveniens in these circumstances is plainly anomalous. The parties are already here, assembling their proofs and witnesses from wherever they may be, and the court system is already burdened. Whether the entire action is tried comprehensively here or elsewhere or whether only a portion of this action is tried here, witnesses will have to travel and documentary proofs will have to be transported. That is inevitable when broad-based controversies between national and international corporations have to be litigated. Nor are the logistical problems insurmountable. As the court noted in Travelers Indem. Co. v. Monsanto Co., 692 F. Supp. 90, 92 (D.Conn. 1988), this is "an age where air travel, express mail, electronic data transmission, and videotaped depositions are part of the normal course of business for companies such as these." The question is not how difficult it will be to try the coverage question but rather how many times Westinghouse is going to have to repeat the process from jurisdiction to jurisdiction.
As we see the issue, forum non conveniens is simply the wrong doctrine in these circumstances. The immediately pertinent question is whether, under all the relevant circumstances and upon a balancing of all the competing public and private interests implicated, the benefits of fractionalizing this litigation, not only into multiple separate parts but also into separate parts sharing a significantly duplicative overlay, so outweigh the private and public burdens which fractionalization inevitably imposes as to justify the involuntary contraction and truncation of this litigation on any theory. We think it does not. We conclude further that the one component of the overall circumstantial complex which is the most critical concern here was insufficiently considered in the trial court's analysis, and that is the factor of piecemeal litigation. This kind of fractionalization is a most potent weapon in the arsenal of the litigant whose primary and subversive aim is to impose both upon the judicial system and the adversary by endlessly *471 delaying the day upon which the entire controversy will finally come to an end and the respective rights of the litigants resolved  clearly, consistently, and finally. It is only the single comprehensive action, designed to adjudicate the entire controversy between litigants, which can protect both the court and the parties from that calculated imposition. See, e.g., Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277 (App.Div. 1977), certif. den. 75 N.J. 528 (1977).
We find a close and instructive analogy in the application, in complex coverage cases involving toxic torts and environmental claims, of the so-called Colorado River rule, which requires that in the absence of exceptional circumstances, the federal courts are obliged to exercise their invoked jurisdiction, notwithstanding the pendency of parallel state court litigation. Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).
There are four significant recent federal decisions supporting a single comprehensive coverage action. In the first, Liberty Mut. Ins. Co. v. Foremost-McKesson, Inc., 751 F.2d 475 (1st Cir.1985), the court affirmed the stay ordered by the Massachusetts District Court of a diversity declaratory judgment action by which Liberty Mutual sought a declaration that it had no coverage obligations on liability policies it had issued until 1970 to Foremost-McKesson in respect of McKesson's manufacture and distribution of diethylstilbestrol (DES). Prior to the commencement of that action, Continental National Assurance Co., which had insured McKesson from 1970 to 1977, had already brought a declaratory action in the state court of California against it and McKesson's other insurers, including Liberty Mutual, to determine respective responsibility, if any, for McKesson's defense and indemnity. By cross-claim, counter-claim and other procedural techniques, the California action ultimately encompassed all McKesson's insurers and all its toxic substances to the end that there was brought "before the *472 California Court all of McKesson's insurers so as to resolve comprehensively McKesson's coverage for claims arising out of exposure to any products it may have manufactured, sold or distributed." 751 F.2d at 476. In affirming the District Court's stay of Liberty Mutual's fractionalized piece of the pending California action as within the exceptional-circumstances exception to the Colorado River doctrine, the First Circuit explained that
Here, as in Colorado River, piecemeal litigation could severely prejudice the rights of one of the parties. Colorado River, supra, [424 U.S.] at 818-19 [96 S.Ct. at 1246-47]. If the federal and state actions were to proceed concurrently, there is the real possibility that the two courts might interpret the same standard policy language differently, with the result that McKesson would find itself without sufficient liability insurance coverage from the insurers after years of paying premiums. Compare Eagle-Picher Industries, Inc. v. Liberty Mutual Insurance Co., 682 F.2d 12, 19 (1st Cir.1982) (asbestosis "results" when it is manifested), cert. denied, 460 U.S. 1028 [103 S.Ct. 1279, 75 L.Ed.2d 500] (1983) with Keene Corp. v. Insurance Co. of North America, 667 F.2d 1034, 1046 (D.C. Cir.1981) (asbestos causes "injury" at time of exposure), cert. denied, 455 U.S. 1007 [102 S.Ct. 1644, 71 L.Ed.2d 875] (1982).
The California action, which was commenced first, is the more comprehensive of the two. It involves all of McKesson's insurers and all of the products for which McKesson faces potential liability. California therefore is the logical forum for the determination of the respective rights and obligations of the parties and serves to further the interest of judicial economy. It is significant that no federal issues are raised in the instant declaratory judgment action and that no federal interest would be served by retaining jurisdiction over the case. [Id. at 477]
A similar result was reached in Lumbermens Mut. Cas. v. Connecticut Bank & Trust, 806 F.2d 411 (2d Cir.1986), in which the Circuit Court affirmed a stay entered by the Connecticut District Court of a declaratory judgment action brought by Lumbermens by which it sought to avoid coverage, as a second layer excess carrier, of asbestos-related claims against its insured, Raymark. It had filed this federal action although it was already a party to a comprehensive coverage suit pending in Illinois to which Raymark and all its various primary and excess carriers were joined and which dealt with coverage questions involving some 30,000 asbestos-related bodily injury *473 claims arising all over the United States since 1941. Adopting the McKesson rationale, the court held that
The critical factor to us, however, is the desirability of avoiding piecemeal litigation and the possibility of two interpretations of the same policy language in different courts, leaving the insured possibly with insufficient coverage from the insurers after years of paying premiums. See Liberty Mutual Insurance Co., 751 F.2d at 477. As the First Circuit said in Fuller Co. v. Ramon I. Gil., Inc., 782 F.2d 306, 309-10 (1st Cir.1986), citing Moses H. Cone, the avoidance of piecemeal litigation should be given great weight in the context of declaratory judgment actions because such litigation would complicate and fragment the trial of cases and cause friction between state and federal courts. [Id. at 414]
Further noting that "Raymark's coverage dispute with any particular insurer necessarily impacts upon the timing of the obligations of the other insurers," the court pertinently held that "Lumbermens' policies must be considered as part of an inclusive controversy most appropriately decided in a single forum." Id. at 414. It thus concluded that, "In an insurance coverage dispute such as is here involved, the interest of an insured in binding as many of its insurers as possible to a single adjudication is a factor strongly weighing in favor of maintenance of an inclusive action." Id. at 415.
Two years later, in General Reinsurance Corp. v. Ciba-Geigy Corp., 853 F.2d 78 (2d Cir.1988), the Second Circuit applied its reasoning in Lumbermens to a multi-state environmental-claim coverage action, the second category of coverage claims here involved. There, Ciba-Geigy had an annually revised insurance program involving both primary and layered excess carriers, which is, as we have come to understand, the customary insuring practice of corporations of this size. In November 1987, two of the excess insurers brought a declaratory judgment action against Ciba-Geigy in the District Court for the Southern District of New York seeking a non-coverage adjudication. Ciba-Geigy, in December 1987, filed an action in the New Jersey Superior Court against its two primary carriers, later amending to join its third primary carrier and its 135 excess carriers, including the federal district court plaintiffs. Claims arising out of 70 sites, including about 12 in New Jersey, were involved in the state action. In affirming the stay *474 of the federal court action, the Second Circuit again emphasized the need for a single comprehensive action and the necessity for avoidance of piecemeal litigation.[4]
In the last of the four cases, Travelers Indem. Co. v. Monsanto Co., supra, 692 F. Supp. 90, plaintiff sought a declaration of non-coverage "in connection with multi-million dollar environmental cleanup claims pending against Monsanto around the country." Ibid. Almost simultaneously with the institution of the federal action, Monsanto filed two suits in the Delaware state court against all 37 of its insurers seeking coverage for these cleanup claims. The district court granted Monsanto's stay motion, deferring, in effect, to the Delaware litigation and holding that:
The purpose of the Delaware action is to determine the respective liabilities of all of Monsanto's insurers whose coverage is implicated in the environmental cleanup claims being lodged against Monsanto. Those claims involve hundreds of millions of dollars, for activity spanning decades at more than forty sites around the country. It is essential that such large-scale complex litigation be managed comprehensively. Such a consideration clearly rises to the level of an "exceptional circumstance." It is undoubtedly for that reason that the overwhelming majority of courts considering motions to stay declaratory actions regarding relatively narrow insurance coverage issues, have granted them in favor of more comprehensive lawsuits better able to resolve the narrower issues in their broader context. This court has thoroughly reviewed the extensive decisional law and voluminous exhibits that both parties have cited and presented and the court is convinced that a stay of this federal action is warranted.
Furthermore, the court is not unmindful that to the extent that the dispute between Monsanto and its carriers, including Travelers, is fragmented, any effort to resolve the matter through settlement is likely to be frustrated. [Id. *475 at 93; footnote omitted][5]
In view both of the strength and breadth of New Jersey's entire controversy policy[6] and the rationale of these federal cases endorsing the maintenance of a single comprehensive coverage action in circumstances such as these, we are convinced, presumptively at least, that there should be no question as to Westinghouse's right to maintain these actions as it framed them. The question then is whether any of the specific reasons relied on by the trial judge or advanced by the parties for fractionalizing the action overcome that presumption. We conclude that they do not.
We address first the trial judge's choice of law concern. Although the choice of law issue has never been reached, the court was concerned that resolution of the coverage questions before it would be inordinately complicated by what it perceived as the potential necessity to apply not a single body of substantive insurance law to the policy interpretation issues but rather multiple substantive rules. It was the court's suggestion that each state's paramount concern with the cleanup of contaminated sites within its own borders created an overriding governmental interest which would warrant application of its own law not only to the issues arising from the fact of contamination but also to the coverage questions, whose resolution would determine the extent to which, if at all, the cleanup costs would *476 be paid for by the insurer rather than the contaminator. 227 N.J. Super. at 517-518.
While not intending to deprecate the legitimacy of local concern for and control over its own environmental contamination, we nevertheless cannot conceive that the operative contract language in a single set of insurance policies issued by a group of insurers for the purpose of providing integrated comprehensive coverage for nationwide risks could mean something different in every state of the union. Obviously, the liability of the insured as a tortfeasor for the governmental and private claims against it will be determined by state law, whose applicable rules may differ from state to state, and by applicable substantive federal environmental and toxic tort law as well. But when comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insured has bought and the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage. See, e.g., Werner Industries, Inc. v. First State Ins. Co., 112 N.J. 30 (1988); State Farm, etc., Ins. Co. v. Simmons' Estate, 84 N.J. 28, 37 (1980).
In our view, the notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectation of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict-of-law terms, to suggest that more than one body of law will apply to a single contract. The theme running through the federal mega-coverage cases is the assumption not only that state law will determine whose insurance law will govern the coverage dispute but also that it will be a single state's law, chosen in accordance with the applicable conflict principles of the forum. Lumbermens Mut. Cas. v. Connecticut Bank & Trust, 806 F.2d 411, 415 (2d Cir.1986). Thus, in Eli Lilly and Co. v. Home Ins. Co., 764 F.2d 876 *477 (D.C. Cir.1985), the court was faced with a coverage action brought by a DES manufacturer against the 242 carriers who covered its products liability risk during the 29 years of its manufacture of that substance. While various choice of law options were presented, no party even suggested, nor did the court consider, the obvious litigation chaos which would have resulted were the coverage to be variantly interpreted in accordance with the law of each state in which the product was sold or in which the claim by an injured person was filed. In the end, the court opted for the law of Indiana, the manufacturer's place of incorporation and principal place of business, to govern all insurance questions raised by the policies wherever negotiated or issued, concluding that Indiana, among all alternative possibilities, had the most significant state interest. See also, e.g., Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Lumbermens Mut. Cas. v. Connecticut Bank & Trust, supra, 806 F.2d at 415; Abex Corp. v. Maryland Cas. Co., 790 F.2d 119 (D.C. Cir.1986).
We are of the further view that Westinghouse is, in any event, entitled to a single, consistent and final resolution of the choice of law question in a single comprehensive action which will bind it and all its insurers. We do not speculate on how the choice of law question should be ultimately resolved  it was neither briefed nor argued in the trial court nor in this court. We note only that there are various options within traditional choice of law principles including, among others, the place where the contracts were negotiated, where they were issued, where they are to be performed, where the parties' principal locations are, and what the parties may have intended. See 1 Restatement (Second), Conflict of Laws, § 6 (1971). The trial court will also have to address the question of whether the same law applies to the various layers of coverage which may have been negotiated separately or elsewhere, and presumably inquiry must be made with respect to the parties' intent. We are, however, convinced that proper prosecution of this litigation *478 requires immediate threshold resolution of the choice of law issues.
It is apparent to us that a prompt choice of law resolution is the key to effective case management of this litigation. That is to say, there is a limited number of identifiable coverage issues, including such questions as trigger of coverage, the scope of the owned-property exclusion, the scope of the pollution exclusion, the meaning of the operative language "accident" and "expected or intended from the standpoint of the insured," and the definition of damages or loss which invoke coverage. These issues can be addressed on two levels. The first is a declaration of interpretative principle respecting each disputed provision of the policies. This task is obviously manageable if the law of only one state is required to be restated. Illustratively, were New Jersey law to control, the body of law here developed in respect of environmental-claim coverage would permit definitive statements to be made of precisely what the disputed policy provisions mean and how they are to be applied to any given set of facts. See, e.g., Diamond Shamrock v. Aetna Cas., 231 N.J. Super. 1 (App.Div. 1989); CPS Chemical v. Continental Ins., 222 N.J. Super. 175 (App.Div. 1988); Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516 (App.Div. 1987).
While we do not predict which state's law would apply, we have no reason to assume that whichever state it is would not have a body of toxic tort and environmental-claim coverage law as clear or as discernible as ours and that the trial court would not be able to articulate it. Once the choice of law issue is resolved, the court could proceed to the next step of entering an order, akin to a partial summary judgment on liability, which would adjudicate the "black letter" law of the case on most, if not all, coverage disputes.[7] We understand that ultimately the *479 coverage questions may be fact sensitive and that site-specific factual findings may have, eventually, to be made. But while specific application of the adjudicated interpretative principles may be fact sensitive, stating those principles is not. That is a matter of law.
The final stage of the litigation must, of course, in some manner and to some degree apply the interpretative principles to the individual claims for which coverage is sought. There are a variety of available techniques. Some claims or classes of claims may be amenable to summary judgment. Some prototype claims may be chosen for trial, a device which might also permit further clarification of the meaning of policy language, if necessary. It may also be that the court, in respect of some claims, will decide that its binding interpretative principle must be applied to a specific claim by litigation elsewhere and may accordingly frame its declaratory judgment as to those claims appropriately to reach that end. Our point is that by careful staging, by limitation of jury use to the narrow factual issues as to which there is a constitutional right to jury, by using a series of juries, and by otherwise employing the complex litigation techniques developed here and elsewhere,[8] maximum justice with minimum administrative burden can be rendered. We must at least endeavor to do so.
Having concluded that the forum non conveniens dismissal of portions of these actions must be reversed, we now consider what we regard as the significant but still undecided forum non conveniens issue. As we have noted, there is presently *480 pending in the Federal District Court for the Western District of Pennsylvania a coverage action brought by Liberty Mutual against Westinghouse and all other insurers. It appears to be precisely congruent with this action in terms of the parties and issues joined. Jurisdiction is based not on ordinary diversity but on the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C.A. § 1330, because of the singular circumstance that the Republic of Ireland owns one of the insurers, the Insurance Corporation of Ireland, Ltd. In Liberty Mutual Insurance Company v. Insurance Corporation of Ireland, Ltd., et al., 693 F. Supp. 340, 349 (W.D.Pa. 1988), the district court denied Westinghouse's motion to dismiss that federal action on jurisdictional grounds, relying on the FSIA and noting as well, as we believe, that "this complicated action ought to be litigated in its entirety in one courtroom."
Hence, there is now an alternate forum for the adjudication of the entire controversy, and we note that following oral argument before us and consistent with the position it then took, Liberty Mutual moved the trial court for an order dismissing the entire action and deferring to the federal court's jurisdiction.[9] Insofar as we are able to determine, that motion is still pending, and we do not intend to suggest how it should be decided. We do, however, point out that in addition to considering the traditional forum non conveniens factors, the trial court should address, as one of the considerations, the question of whether a federal district court, because of the nature of the federal system and its procedural jurisprudence, is better able to handle this case logistically and mechanically. Interdistrict techniques may be available to it which are as yet unavailable on an interstate cooperative effort and which may simplify multi-state proof problems. See, e.g., 28 U.S.C.A. § 1407 (multi-district litigation). See also the Manual for Complex Litigation *481 Second, supra. And see, generally, American Law Institute, Complex Litigation Project, Council Draft No. 1 (1988).
The order appealed from is reversed, and we remand for further proceedings consistent herewith.
NOTES
[1] Thermo King Corporation, a wholly owned subsidiary of Westinghouse, is a co-plaintiff in one of the two actions, the so-called environmental claim action described infra. For convenience, we do not separately refer to it, although it should be understood to be included in our references to "Westinghouse" and "plaintiff."
[2] This group includes not only Liberty Mutual but 86 "London" companies as well as Allstate Insurance Company and First State Insurance Company.
[3] This group includes, in addition to Lumbermens, Puritan Insurance Company ("Puritan"), Appalachian Insurance Company of Providence, Northwestern National Insurance Company of Milwaukee, Old Republic Insurance Company, Zurich Insurance Company, AIU Insurance Company, Allianz Insurance Company, Allianz Underwriters, Inc., American Centennial Insurance Company, American Home Assurance Company, Atlanta International Insurance Company, Granite State Insurance Company, The Insurance Company of the State of Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, National Continental Insurance Company and National Union Fire Insurance Company of Pittsburgh, Pa.
[4] In an interesting note, the Second Circuit rejected the insurers' argument that by reason of the trial court's decision in this case and the companion case of SCM Corporation v. Lumbermens Mutual, which we decide this day, "New Jersey courts increasingly refuse to entertain claims in insurance-related judgment actions which involve hazardous waste sites outside New Jersey." 853 F.2d at 82. The court simply concluded, without analyzing the insurers' characterization of New Jersey law, that Ciba-Geigy was, in any event, distinguishable on its facts as having a closer New Jersey nexus in this context.
[5] Following the stay of the Federal District Court action, the defendant insurers moved the Delaware court for a forum non conveniens dismissal order based on the site-specific approach argued here. The motion was denied following a written opinion by Judge Martin in which he concluded that the burdens of piecemeal litigation far outweighed the burdens of a single comprehensive Delaware litigation. See Monsanto Company v. Aetna Casualty and Surety Company, et al., Superior Court of Delaware, Docket No. 88C-JA-118 (decided October 21, 1988).
[6] See, e.g., Crispin v. Volkswagenwerk, A.G., 96 N.J. 336 (1984); Thornton v. Potamkin Chevrolet, 94 N.J. 1 (1983); Aetna Ins. Co. v. Gilchrist Brothers, Inc., 85 N.J. 550 (1981); Falcone v. Middlesex County Med. Soc., 47 N.J. 92 (1966); Foley Machinery Co. v. Amland Contractors, 209 N.J. Super. 70 (App.Div. 1986); Mori v. Hartz Mountain Development Corp., 193 N.J. Super. 47 (App.Div. 1983).
[7] For example, it could surely be determined as a matter of policy construction whether the policy provides that the risk accrues on exposure or manifestation of injury, or whether cleanup and other remedial efforts on owned property are covered if the work is undertaken to remedy or avoid damage on other property, or whether an insured's response to a governmental cleanup demand is within covered damages. It does not appear that there is any disputed coverage question that is not subject to interpretative declaration of principle.
[8] See Manual for Complex Litigation Second, 1A-Pt2 Moore's Federal Practice.
[9] Indeed, on motion made to us, we expressly remanded to the trial court in order to enable it to consider that motion pending this appeal. See R. 2:9-1.