NATIONAL STARCH AND CHEMICAL CORPORATION, Plaintiff,

v.

GREAT AMERICAN INSURANCE COS.; Insurance Co. of North America; Affiliated FM Insurance Co.; National Union Insurance Co. of Pittsburgh, Pa., et al., Defendants.

GREAT AMERICAN INSURANCE COS., Third–Party Plaintiff,

v.

INSURANCE CO. OF NORTH AMERICA; Affiliated FM Insurance Co.; National Union Fire Insurance Co. of Pittsburgh, Pa., Third–Party Defendants.

Civ. A. No. 86–4481.

United States District Court, D. New Jersey.

July 19, 1990.

Glenn Clark, Andrew Perel, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for plaintiff.

Thomas D. Flinn, Garrity, Fitzpatrick, Graham, Hawkins & Favetta, Montclair, N.J., for defendant National Union Fire Ins. Co. of Pittsburgh, Pa.

Charles K. Meuse, Priestly, McGuire & Wachenfeld, Newark, N.J., for defendant Affiliated FM Ins. Co.

## OPINION

HAROLD A. ACKERMAN, District Judge.

Plaintiff, National Starch & Chemical Corporation, ("NSCC"), filed this diversity action seeking a declaration that defendant insurers are obligated, under various Comprehensive General Liability ("CGL") insurance policies, to defend and indemnify it in connection with its alleged liability for environmental contamination at a number of sites throughout the country. Presently before the Court is a motion by plaintiff, NSCC, for a declaration that New Jersey law governs interpretation of the insurance policies issued to it by defendants National Union Fire Insurance Company ("National Union") and Affiliated FM Insurance Company, ("AFM"). Defendant, National Union, has likewise moved seeking a determination that New York law governs interpretation of the policies it issued.[1] Defen-

---

1. New Jersey law is significantly more favorable to the insured than New York law. New Jersey courts liberally interpret pollution exclusion clauses in favor of the insured, as well as exclusions for damages on the property of the insured. *See Broadwell Realty Serv., Inc. v. Fidelity & Cas. Co.,* 218 N.J.Super. 516, 528–31, 528 A.2d 76 (App.Div.1987); *Jackson Tp. Mun. Util* *Auth. v. Hartford Acc. & Indem. Co.,* 186 N.J.Super. 156, 164–65, 451 A.2d 990 (Law Div.1982). In comparison, it appears that New York courts take a more restrictive view of pollution exclusion clauses. *See Technicon Elec. Corp. v. Am. Home Assur. Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91 (A.D. 2 Dept.1988), *aff'd,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), *reh'g de-*

dant, Aetna Casualty & Insurance Company, ("Aetna"), had moved for a declaration that Tennessee law governs the insurance policies it issued to Lutex Chemical Corporation, (which was later purchased by NSCC). However, plaintiff did not oppose Aetna's motion and the parties have stipulated that Tennessee law applies to those policies. Thus, I need only decide the motions made by NSCC and National Union. AFM has not opposed the motion made by NSCC seeking an Order that New Jersey law applies to the policies AFM issued.

## I. FACTUAL BACKGROUND

Plaintiff, NSCC, is incorporated in the state of Delaware. *See* First Amended Complaint, filed Dec. 4, 1987, ¶ 1. It has operations throughout the United States and the world. *See* Certification of Frank J. Frey, filed May 18, 1990, ("Frey Cert."), ¶ 7. However, NSCC's principal place of business and corporate headquarters is in Bridgewater, New Jersey, where it has manufacturing facilities as well. *Id.; see also* Certification of Alex M. Samson, Jr., May 16, 1990, ("Samson Cert."), ¶ 3. NSCC also has facilities located in Bloomfield, Plainfield and Englewood, New Jersey. Samson Cert., ¶ 5. In connection with these facilities, NSCC employs approx-

imately 1,800 New Jersey residents, out of a total domestic workforce of 3,896 representing more than forty-five percent of NSCC's employees in the United States. *Id.*, ¶ 9. In 1989, NSCC paid $819,816 in property taxes for property located in New Jersey and it will pay approximately $2,222,500 in state income taxes for that year. *Id.*, ¶ 6.

NSCC has made claims to defendants, National Union and AFM, for defense costs and indemnification relating to its alleged liability for environmental contamination at sites located in New Jersey, North Carolina, Maryland, South Carolina, Illinois, Texas, Rhode Island, Tennessee, Indiana, New York, Pennsylvania and California. *See* Samsom Cert., ¶ 10. Overall, there are twenty-two sites for which NSCC has made claims, and nine of these sites are located in New Jersey. *See id.* These nine sites are Duane Marine in Perth Amboy; the Chemical Control site in Elizabeth; Kin-Buc and Kenney landfill in Elizabeth; the Wilson Avenue site in Newark; the SCP Carlstadt site in Carlstadt; Frontage Road in Newark; and NSCC's manufacturing sites located in Bridgewater, Plainfield and Bloomfield. *See* Supplemental Certification of Jeffrey B. Wagenbach, June 4, 1990, ("Supp. Wagenbach Cert."), ¶ 3.[2] Al-

---

*nied,* 74 N.Y.2d 893, 547 N.Y.S.2d 851, 547 N.E.2d 105 (1989); *cf. Avondale Indus., Inc. v. Travelers Indemn. Co.,* 887 F.2d 1200, 1205–06 (2d Cir.1989) (distinguishing *Technicon* ), *reh'g denied,* 894 F.2d 498 (2d Cir.1990), *cert. denied,* —— U.S. ——, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1989).

Further, it appears that New Jersey courts would adopt a "triple trigger" theory of liability holding jointly and severally liable all insurers on the risk from the time of initial dumping to discovery of the environmental contamination, with the insured being entitled to select from which policy it will be indemnified. *See Lac D'Aminte Du Quebec, Ltee v. Am. Home Assur. Co.,* 613 F.Supp. 1549, 1559 (D.N.J.1985) (predicting that New Jersey would follow triple trigger theory of *Keene Corp. v. Ins. Co. of N. Am.,* 667 F.2d 1034 (D.D.C.1981)); *see also Hoffmann–La Roche Inc. v. The Hartford Group,* No. W–015519–87, slip op. (N.J.Sup.Ct. Law Div., Essex County October 13, 1989) (Lester, J.) (applying triple trigger theory of *Keene* to claims related to liability for environmental contamination and permitting insured to select the policy of indemnification); and *CPS Chem. Co. v. Continental Ins. Co.,* 199 N.J.Super. 558, 565–66,

489 A.2d 1265 (Law Div.1984) (duty to defend commences with initial disposal and continues to date of discovery), *reversed on other grounds,* 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985); *compare Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.,* 662 F.Supp. 71, 76 (E.D.Mich.1987) (holding that "each exposure of the environment to a pollutant constitutes an occurrence and triggers coverage"). In comparison, it appears that New York courts would not adopt such a theory of liability. *See Am. Home Prod. v. Liberty Mut. Ins. Co.,* 565 F.Supp. 1485, 1497 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984) (rejecting *Keene* and adopting "injury in fact" theory); *Am. Motorists Ins. Co. v. Levelor,* No. 88–1994, 1988 WL 112142 (D.N.J. Oct. 14, 1988) (Sarokin, J.) (construing New York law) (adopting a "first discovery rule" to hold that only the insurer who was on the risk at the time the environmental contamination was first discovered is liable), *appeal dismissed,* 879 F.2d 1165 (3d Cir.1989).

**2.** While only four of these nine sites are identified in the Complaint, NSCC has made claims relating to all nine sites and it is attempting to

though nine sites are located in New Jersey, only one site is located in New York. Apart from New Jersey, the state with the next largest number of sites is South Carolina, which has three. *See* Samson Cert., ¶ 10.

## A. *Issuance of National Union Policies*

Defendant, National Union, is incorporated in the state of Pennsylvania, and its principal place of business is New York. *See* National Union's Answer to the First Amended Complaint, filed Jan. 21, 1988, ¶ 2, (admitting allegations of First Amended Complaint, ¶ 5). National Union is authorized to do business in New Jersey and every state of the United States. *See* deposition of Thomas M. Lanigan, Jan. 15, 1990, at 26; Flinn Cert., May 29, 1990, Exhibit A. In 1987, National Union received New Jersey direct premiums of $316,773,652.00, accounting for 5.8% of its worldwide premiums and in that year, it also suffered 5.8% of its losses in New Jersey. *See* Certification of Andrew J. Perel, filed May 18, 1990, ¶¶ 18–19 and Exhibit B.

From 1979 through the present, National Union provided CGL insurance policies to NSCC. *See* Frey Cert., ¶ 3. During the time that the National Union policies were in force through 1988, Mr. Frank Frey served as NSCC's Insurance Manager, Director of Insurance, and Director of Risk Management at NSCC's offices in Bridgewater, New Jersey. *Id.*, ¶ 4. Mr. Frey solicited, procured, evaluated, and administered the policies from NSCC's offices in Bridgewater, New Jersey. *Id.*, ¶ 5.

Although Mr. Frey solicited the policies from New Jersey, the policies were negotiated by NSCC's insurance brokers in New York. *See* deposition of Mr. Frey, Feb. 17, 1990, at 52, 77–78, 98–99; Flinn Cert., May 18, 1990, Exhibit B. The insurance brokers were paid by defendant, National Union. *Id.* at 77–78. The underwriting and issuance of the policies occurred in New York, and they were countersigned by use of a rubberstamp in New York as well. *See* Lanigan dep., Jan. 15, 1990, at 49–52; Flinn Cert., May 18, 1990, Exhibit C.

While the policies of insurance were negotiated and issued from New York, there were meetings in New Jersey concerning the policies. In particular, Mr. Frey met with NSCC's brokers in New Jersey. Frey dep. at 51, 63; Wagenbach Cert., May 29, 1990, Exhibit A. On a number of occasions, Mr. Frey met with various representatives of National Union in New Jersey. Frey dep. at 62–65, 71, 75, 76; Flinn Cert., May 18, 1990, Exhibit B. Mr. Frey also had a meeting in New Jersey with a representative of American International Group, ("AIG") (of which National Union is a member), which served as a condition to NSCC's policies with National Union. *Id.* at 68, 71–74. Quotes were sent to NSCC in New Jersey, (*id.* at 78), and Mr. Frey engaged in various phone calls and correspondence from his office in New Jersey concerning the policies. *See* Frey Cert., ¶ 5. On one occasion, an endorsement was excluded from the contracts because, among other reasons, it was not necessary under New Jersey law. *See* Frey Cert., ¶ 19 and Exhibit I.

With respect to performance of the contracts, premium notices were sent from National Union in New York to NSCC's broker in New York. The premium notices list the insured as NSCC with its address being Bridgewater, New Jersey. Frey Cert., Exhibit S. NSCC paid the premiums from its Bridgewater, New Jersey office to its brokers in New York who then transmitted the payments to National Union in New York. *See* Frey Cert., ¶ 18. In the event of delayed payments, Notices of Cancellation and Notices of Rescission were issued directly to NSCC in New Jersey. *See* Frey Cert., ¶ 17 Exhibit H. Claims handling procedures were coordinated by Mr. Frey out of NSCC's New Jersey offices. *See* Frey Cert., ¶ 16. Each of the policies listed the "named insured" as

---

settle the claims regarding the sites which have not been included in the pleadings. *See* Supp. Wagenbach Cert., ¶¶ 3, 4. Counsel for NSCC represents that he intends to amend the Complaint to add these other five sites, *id.*, ¶ 4, and that leave has been granted by the Magistrate for such an amendment.

NSCC with the address of the insured being Bridgewater, New Jersey. *See* Frey Cert., ¶¶ 8–9 and Exhibit B.

### B. *Issuance of AFM Policies*

AFM has stipulated that plaintiff's principal place of business is New Jersey, and that the policies it provided to plaintiff were issued and countersigned in the State of New Jersey. *See* Stipulation and Order filed Feb. 2, 1990. AFM is incorporated in the State of Rhode Island where it has its principal place of business, and it is authorized to do business in the State of New Jersey. *See* AFM's Answer to the First Amended Complaint, filed Dec. 23, 1987, ¶ 4. As stated above, AFM has not opposed NSCC's motion seeking a declaration that New Jersey law applies to the policies it issued.

## II. DISCUSSION

### A. *National Union Policies*

There is a genuine conflict between New Jersey law and New York law which must be resolved in this matter. *See supra*, note 1. As a district court sitting in New Jersey, I must look to the conflict of law rules prevailing in the State of New Jersey to determine the choice of law to be applied in this case. *Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 494, 61 S.Ct. 1020, 1020, 85 L.Ed. 1477 (1941); *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir.1988). In applying state law, this Court's role "is to predict what the Supreme Court of New Jersey would decide if confronted by the same set of circumstances." *Aetna Cas. & Sur. Co. v. Farrell*, 855 F.2d 146, 148 (3d Cir. 1988). In *State Farm Ins. Co. v. Simmons' Estate*, 84 N.J. 28, 417 A.2d 488 (1980), the New Jersey Supreme Court discussed the factors to be taken into consideration when deciding choice of law issues relative to insurance policies.

However, before engaging in an analysis of *State Farm* and its application to the facts at hand, I note that the sites in question for which NSCC demands coverage are located across the country. In *Leksi, Inc. v. Fed. Ins. Co.*, 736 F.Supp. 1331 (D.N.J. 1990) (Brotman, J.), the court adopted a rule that could effectively call for application of different states' laws to one contract of insurance where the underlying claims concern environmental contamination. In particular, in *Leksi*, the court held that, in such cases, "the state where the toxic waste comes to rest is the state whose law will apply, provided that it was reasonably foreseeable that the waste would come to rest there." However, *Leksi* involved waste sites located in only one state, namely, New Jersey, (*see* 736 F.Supp. at 1332), and it is not clear whether Judge Brotman would apply the same rule in cases involving waste sites in more than one state. In *Westinghouse v. Liberty Mut. Ins. Co.*, 233 N.J.Super. 463, 476, 559 A.2d 435 (App.Div.1989), the New Jersey Appellate Division clearly opined that one state's law should apply to one policy of insurance regardless of whether the wastes have been deposited in a number of states:

> when comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insured has bought and the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage.

> In our view, the notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectations of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict-of-law terms, to suggest that more than one body of law will apply to a single contract.

*Id.* at 476, 559 A.2d 435.

This case involves twenty-one different waste sites located in twelve different states. The parties do not argue that the law of a number of states applies, but rather, they argue that either New York or New Jersey law applies regardless of the locality of the waste sites. I find that it would be unreasonable and contrary to the

parties' reasonable expectations to apply twelve different bodies of law to the contracts of insurance at issue here. In interpreting insurance policies, the reasonable expectations of the parties is controlling. *Meier v. New Jersey Life Ins. Co.*, 101 N.J. 597, 612, 503 A.2d 862 (1986); *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 336–68, 495 A.2d 406 (1985); *Mazzilli v. Accident & Cas. Ins. Co.*, 35 N.J. 1, 7–8, 170 A.2d 800 (1961); *Killeen Trucking v. Great Am. Surplus Lines Ins. Co.*, 211 N.J.Super. 712, 716–17, 512 A.2d 590 (App.Div.1986).

Moreover, in predicting "what the Supreme Court of New Jersey would decide if confronted by the same set of circumstances," (*Aetna, supra,* at 148), opinions of an intermediate appellate court may be deemed presumptive evidence of state law. *White v. Johnson & Johnson Prod., Inc.*, 712 F.Supp. 33, 37 (D.N.J.1989). Thus, although the location of the waste sites is of paramount concern, I cannot simply apply the law of the states where the toxic wastes came to rest. Rather, following the reasoning of *Westinghouse*—which is obviously based upon considerations of judicial economy, uniformity and certainty in the law, as well as deterrence of forum shopping—I will apply the law of only one state to interpret the policies in this case. *Cf. Travelers Indem. Co. v. Allied–Signal, Inc.*, 718 F.Supp. 1252, 1256 (D.Md.1989) (applying Maryland law to interpret a policy as applied to a Maryland waste site and dismissing, without any discussion, claims relating to sites in other forums); *Chesapeake Util. Corp. v. Am. Home Assur.*, 704 F.Supp. 551, 557 (D.Del.1989) (applying Maryland law to interpret a policy as applied to a Maryland waste site and Delaware law to interpret the same policy as applied to a Delaware waste site).[3]

Having found that I shall apply the law of only one state, I must analyze *State Farm* and the facts of this case to determine what body of law that shall be. NSCC and National Union have presented differing interpretations of the Court's opinion in *State Farm.* It appears that NSCC interprets that decision to mean that the law of the state in which the principal situs of the insured risk was located during the term of the policy should govern. Defendant, National Union, argues that *State Farm* requires strict application of the law of the place of contracting, unless the significant relationship of another state dictates that this basic rule should yield.

It is important to keep in mind the historical context in which *State Farm* was decided. *State Farm* involved a reconsideration of the choice-of-law principles expressed in *Buzzone v. Hartford Acc. & Indemn. Co.*, 23 N.J. 447, 129 A.2d 561 (1957). *See* 84 N.J. at 30, 417 A.2d 488. In *Buzzone,* the Court had applied the *then* settled rule that "the rights and liabilities of the insurer … are to be determined by the law of the state where the contract was made." *Id.* at 452, 129 A.2d 561. In *State Farm,* the insured argued that this ironclad and "settled" rule was outmoded in light of the Court's adoption of a significant relationship standard for resolving choice of law issues in tort cases. *See* 84 N.J. at 34, 417 A.2d 488. *See also Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429 (3d Cir.1982) (recognizing that New Jersey abandoned rule that required appli-

---

3. *Westinghouse* was criticized in *Travelers Indem. Co., supra,* 718 F.Supp. at 1257, where the court "inferred" that the *Westinghouse* decision was motivated by a desire to induce large corporations to do business in New Jersey. I strongly disagree that such an inference concerning an ulterior motive for a judicial decision can so readily be imputed to New Jersey's appellate court. Moreover, the fact—if it is a fact—that large corporations may find it favorable to do business in New Jersey due to its laws on insurance has little (if anything) to do with the *Westinghouse* decision. As revealed by the discussion *infra,* New Jersey's choice of law rules do not turn solely on the location of the insured.

Thus, application of one body of law to one policy of insurance could very well result in the application of the law of a state other than New Jersey, even where the insured is a large corporation with a substantial presence in New Jersey, (such as where a large number of waste sites are located in another state and/or where, for some other reason, there is a more substantial relationship to another state.) As I opined above, *Westinghouse* is clearly based upon considerations of judicial economy, uniformity in the law and deterrence of forum shopping. As such, the New Jersey Appellate Division's reasoning does not deserve the harsh criticism expressed in *Travelers Indem., supra.*

cation of law where the tort occurred in favor of the "significant relationship" test), *citing Rose v. Port of New York Auth.*, 61 N.J. 129, 139–40, 293 A.2d 371 (1972).

In response to the insured's argument, the *State Farm* Court indicated that a "significant relationship" test is relevant in resolving choice of law issues as applied to insurance contracts. 84 N.J. at 34–35, 417 A.2d 488. However, the Court declined to overrule or criticize *Buzzone* on the grounds that *Buzzone* "is not inconsistent with this approach." *Id.* at 35, 417 A.2d 488. The Court accepted the principle expounded by the *Restatement* that contracts of insurance "are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." *Id., citing Restatement (Second) of Conflict of Laws* § 193 (1971). The Court opined, however, that "the law of the place of the contract *ordinarily* governs the choice of law *because* this rule will generally comport with the *reasonable expectations of the parties concerning the principal situs of the insured risk* during the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law." *Id.* at 37, 417 A.2d 488 (emphasis added).

Thus viewed, it becomes clear that *State Farm* ordinarily calls for application of the place of contracting *because* this rule generally comports with the reasonable expectations of the parties concerning the principal situs of the insured risk. As I stated above, the reasonable expectations of the parties are controlling. *See supra,* at 322–323. Thus, *State Farm* must be applied with a view toward fulfillment of the parties' objectively reasonable expectations. It requires

a full comparison of the significant relationship of each state with the parties and the transaction. That assessment

should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.

*State Farm,* 84 N.J. at 37, 417 A.2d 488.

In addition, more recent New Jersey cases give little (if any) weight to the place of contracting and look primarily to "the law of the state which has the most significant contact with a contract and the parties to that contract." *McCabe v. Great Pacific Century,* 222 N.J.Super. 397, 399, 537 A.2d 303 (App.Div.1988) (applying New Jersey law to insurance dispute, because New Jersey had most significant contacts, even though policy expressly stated it was "made under Indiana law"); *Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.,* 208 N.J.Super. 666, 672–73, 506 A.2d 817 (App.Div.1986) ("[t]he modern conflict of laws approach in contract actions applies the 'most significant relationship standard' "); *see also Cessna Aircraft Co. v. Fidelity & Cas. Co.,* 616 F.Supp. 671, 676 (D.N.J.1985) (applying New Jersey law to insurance contract dispute even though New Jersey may not have been the place of contracting, because the underlying cause of action concerned New Jersey residents and the determination of liability took place in New Jersey). *Compare Chesapeake Util. Corp., supra,* at 555 ("Delaware courts have moved away from the traditional rule that the law of the place of contract formation governs, in favor of the more modern and flexible 'most significant relations' test of the Restatement (Second) Conflict of Laws § 188 (1971)"); *but cf. Johnson–Matthey, Inc. v. Penn. Mfgrs. Assoc. Ins. Co.,* No. L–78660–87 (N.J.Sup. Ct.Law Div., Essex Cty., March 12, 1990) (Thompson, J.) (applying law of place of contracting even though the toxic waste site was located in New Jersey).[4]

---

**4.** This development of the law away from a *lex locus contractus* analysis and toward a significant relationship test comports with the process undergone by the New Jersey courts in the tort area. Initially, when New Jersey rejected the *lex locu delictus* analysis for tort cases, the Court stated that the rule "should not be applied mechanically, but that courts should give atten-

tion to other factors which are relevant to the choice of law process." *Mellk v. Sarahson,* 49 N.J. 226, 229, 229 A.2d 625 (1967). As time went on, however, the Court completely disengaged itself from the *lex locu delictus* approach and focussed on the governmental interest and significant relationship tests. *Compare Rose, supra,* 61 N.J. at 139–40, 293 A.2d 371.

Accordingly, the place of contracting should be taken into consideration but it is by no means determinative or entitled to presumptive weight as National Union suggests. Rather, the inquiry concerning choice of law is more appropriately directed toward a determination of which state has the most significant contacts with the contracting parties, with the place of contracting being taken into consideration in the analysis. Factors to be considered in determining which state has the most significant relationship include

(1) the place of contracting;

(2) the place of negotiating the contract;

(3) the place of performance;

(4) the location of the subject matter of the contract, and

(5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Leksi, supra,* at 1334, *citing Restatement (Second) of Conflict of Laws* § 188; *see also State Farm,* 84 N.J. at 38, 417 A.2d 488 (looking to insured's and insurer's domicile and location of subject matter of insured risk). Other factors to consider include the justifiable expectations of the parties, and the relevant state policies and governmental interests as revealed by their legislation and caselaw. *See State Farm, supra,* at 39, 417 A.2d 488; *Leksi, supra,* at 1333.

In the instant case, it appears that the place of contracting was primarily New York and that the contract was negotiated by NSCC's brokers in New York. The "place of contracting is the place where occurred the last act necessary ... to give the contract binding effect." *Restatement (Second) of Conflict of Laws,* § 188, Comment (e) (1971); *cf. Sandoz, Inc. v. Employer's Liability Assoc. Corp.,* 554 F.Supp. 257, 262 (D.N.J.1983) (finding that New Jersey was the place of contracting and New Jersey law applied where a Massachusetts corporation with its principal place of business in Massachusetts issued a policy to a New Jersey insured). The National Union policies were countersigned in New York, which was the "last act" needed to give the policies binding effect. In addi-tion, although the policies were eventually issued to NSCC in New Jersey, this was done through NSCC's brokers in New York.

However, while the place of contracting and of negotiation was New York, there were numerous contacts with New Jersey during these events. The policies of insurance were eventually delivered to NSCC in New Jersey. Mr. Frey of NSCC solicited its brokers, (paid by National Union) from its New Jersey office, and he evaluated and approved the policies there. In addition, there were numerous meetings and correspondence in New Jersey between NSCC's brokers, representatives of National Union, and Mr. Frey of NSCC.

With respect to performance of the contract, the contract was not performed solely in New York. The place of performance of an insurance contract is the place where premiums are paid. *See Equitable Life Ins. Assoc. v. Nikolopulos,* 86 F.2d 12, 14 (3d Cir.1936), *cert. denied,* 300 U.S. 660, 57 S.Ct. 436, 81 L.Ed. 869 (1937). Although premiums were paid to National Union in New York, the premium notices listed the address of the insured as New Jersey, and payments were made from NSCC in New Jersey. Also, Notices of Cancellation and Rescission were sent directly to NSCC's offices in New Jersey. Thus, the contract was performed in both New York and New Jersey.

As for the location of the subject matter of the contract, NSCC has clearly demonstrated that this location is New Jersey. Each of the policies issued to NSCC lists Bridgewater, New Jersey, as the address of the insured, which is NSCC's principal domicile. Although NSCC has offices located throughout the world, it employs forty-five percent of its United States workforce in New Jersey and operates four facilities in New Jersey. On the other hand, it appears from the pleadings that National Union's domicile is New York although it has a substantial presence in New Jersey.

With regard to the justifiable expectations of the parties, National Union emphasizes that NSCC's employees testified that they did not consider choice of law issues

at the time of contracting. *See* Frey dep., Feb. 17, 1990, at 38, 96; Flinn Cert., May 18, 1990, Exhibit B; Baumgarten dep., Mar. 1, 1990, at 35; Flinn Cert. May 18, 1990, Exhibit D. However, National Union has not proffered the testimony of any witnesses to demonstrate that they expected New York law would apply. In addition, at one time an endorsement was excluded from a policy because it was not necessary under New Jersey law, and there has been no citation to any other provisions in connection with which reference has been made to a particular states' law.

In sum, the place of contracting and negotiating was New York, although there were some ties with New Jersey at that time. The contracts have been performed in both New York and New Jersey. The location of the subject matter of the contract has primarily been New Jersey. The domicile and residence of plaintiff, NSCC, is principally in New Jersey. While the domicile and residence of defendant, National Union, is principally in New York, National Union has a significant presence in New Jersey having received in excess of $300 million in premiums from New Jersey in 1987. Neither party is incorporated in either New York or New Jersey. To the extent there is any evidence of the parties' expectations, it points towards New Jersey.

I find that these factors, discussed above, are tipped toward application of New Jersey law. Moreover, the balance tips decidedly in favor of New Jersey when it is recognized that nine of the waste sites for which claims have been made are located in New Jersey and only one site is located in New York. The fact that New Jersey houses significantly more waste sites at issue under the subject policies than any other state gives New Jersey a significant and dominant interest in this

matter. As recognized by Judge Brotman in *Leksi, supra,* "it is difficult to imagine any interest that New Jersey could have that would be more compelling, or in the language of *State Farm,* more 'dominant and significant' than its interest in determining the availability of funds for the cleanup of hazardous substances located within its boundaries." *Leksi, supra,* at 1335. Indeed, in *Witco Corp. v. Travelers Indemnity Co.,* No. 86–2997, slip op., 1987 WL 65060 (D.N.J. May 1, 1987), Judge Bissell applied New Jersey law to the dispute, even though the contract was negotiated and made in New York between a New York insurer and a New York insured, both of whom had New York insurance brokers. Judge Bissell decided that, despite the strong contractual ties to New York, New Jersey had a dominant interest in the matter due to the fact that the waste sites at issue were located in New Jersey.[5]

Moreover, the liberal approach New Jersey courts have taken concerning insurance coverage in the area of environmental contamination should be taken into consideration. *See supra,* note 1; *compare State Farm, supra,* 84 N.J. at 41, 417 A.2d 488 (comparing Alabama and New Jersey law on insurance coverage in choice-of-law analysis). Application of another state's law could preclude fulfillment of New Jersey's policies in this regard even though the greatest number of waste sites are located there. Further, New Jersey has a significant interest in compensating its domiciliaries, *Dent v. Cunningham,* 786 F.2d 173, 177 (3d Cir.1986), and NSCC is domiciled in New Jersey. Accordingly, for all the foregoing reasons, I find that New Jersey law should govern interpretation of the insurance policies issued by National Union to NSCC.

---

**5.** Other courts have also recognized that each state has a significant interest in disputes involving waste sites within their respective borders. *See Travelers Indem., supra,* at 1256; *Chesapeake Util. Corp., supra,* at 557; *cf. Johnson–Matthey, supra* (applying Pennsylvania law to dispute involving New Jersey waste sites). Although I do not in the least bit wish to denigrate the interests of the other states who have sites at issue in this case, I have determined that one

state's law shall apply, and New Jersey clearly has the more dominant interest here. It should be emphasized that this decision is not based solely upon the fact that New Jersey has the greatest number of waste sites, but I have also considered the other ties which New Jersey has to this matter. Other than New York, no state has ties to this matter that could even be compared to those of New Jersey.

### B. *AFM Policies*

The conclusion set forth applies with even greater force to the policies issued by AFM. With respect to the AFM policies, the location of the subject matter of the policies and the domicile of the insured are New Jersey, and the place of contracting and negotiation was New Jersey. In addition, the sites for which claims have been made under the AFM policies are also primarily located in New Jersey. Accordingly, I find that New Jersey law governs interpretation of these policies of insurance.

### III. CONCLUSION

For all the foregoing reasons, I find that interpretation of the policies of insurance issued by defendants National Union and AFM shall be governed by New Jersey law.