**GENERAL METALCRAFT, INC., Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant.**

**Civ. A. No. 91–3022.**

United States District Court, D. New Jersey.

June 26, 1992.

---

Kevin M. McKenna, Voorhees, N.J., for plaintiff.

William P. Krauss, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, N.J., for defendant.

## OPINION

GERRY, Chief Judge.

This matter involves an insurance coverage dispute between plaintiff General Metalcraft, Inc. ("General Metalcraft") and defendant Liberty Mutual Insurance Company ("Liberty Mutual"). Plaintiff, a manufacturer of filing cabinets, which are distributed nationally, faces liability in connection with the disposal of its hazardous wastes at various landfills in New Jersey. Currently before the court is plaintiff's motion for a declaratory judgment that New Jersey law, as opposed to Pennsylvania law, should be applied to interpret the "sudden and accidental" language in the "pollution exclusion" clause found in liability insurance policies plaintiff purchased from defendant.

The pollution exclusion clauses at issue provide that the policies do not apply to

bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.* (Emphasis supplied.)

We gather that only under New Jersey law, as it currently stands, would defendant be compelled to provide insurance coverage to plaintiff.[1]

---

1. *Compare Lower Paxton Township v. United States Fidelity & Guaranty Co.*, 383 Pa.Super. 558, 557 A.2d 393, 399 (1989) (under Pennsylvania law the pollution exclusion clause has been

Thus, we face a true conflict of laws, the resolution of which is critical to the outcome of this litigation, and we may address the question pursuant to our power under the Declaratory Judgment Act, 28 U.S.C. § 2201. *See ACandS, Inc. v. Aetna Casualty & Surety Co.*, 666 F.2d 819, 822 (3d Cir.1981); *Michigan Welfare Rights Organization v. Dempsey*, 462 F.Supp. 227, 230 (E.D.Mich.1978).

## BACKGROUND

Plaintiff is a Pennsylvania corporation with its manufacturing facility and principal place of business in Delaware. At times relevant to this litigation, plaintiff also maintained offices in Pennsylvania. Defendant is a Massachusetts mutual insurance company with its principal place of business in Massachusetts and offices in various states, including New Jersey and Pennsylvania.

Beginning either in 1971 or 1972,[2] through August of 1980, plaintiff purchased a series of liability insurance policies through defendant's Pennsylvania office. Accordingly, defendant delivered policies to plaintiff's Pennsylvania office, and premiums were delivered by plaintiff to defendant's Pennsylvania offices. Defendant provided various services to plaintiff through its Pennsylvania office. Additionally, plaintiff filed claims at defendant's claim facility in Pennsylvania. These transactions form the basis of defendant's contention that Pennsylvania is the place of contracting.

Between 1972 and 1976, when insured by defendant, plaintiff transported paint waste from its manufacturing facility in Delaware to a New Jersey waste removal company, Jonas Waste Removal, for disposal at sea. However, this company allegedly deposited the stuff in various New Jersey landfills which subsequently became the subject of state and federal clean-ups. The events leading to this coverage lawsuit began in 1988 and 1989 when plaintiff was named as a "potentially responsible party" with respect to a number of the clean-up actions.

## DISCUSSION

### A. *New Jersey's Choice of Law Rule*

In diversity matters we follow the choice of law rules of New Jersey. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir. 1988). With respect to liability insurance contract controversies, the New Jersey Supreme Court has adopted a form of the "most significant relationship" analysis of the Restatement (Second) of Conflict of Laws (1971) (the "Restatement"). *See State Farm Mutual Auto Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34–37, 417 A.2d 488, 491–93 (1980).

In short, this analysis provides that:

> [T]he law of the place of contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

*Id.* at 37, 417 A.2d at 493.

Additionally, the *State Farm* court held that the law of the place of contract, the so-called *lex loci contractus*,

> ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during the term of the policy and will furnish needed certainty

construed to exclude coverage for pollution unless it results from a discharge which "is both sudden, meaning abrupt and lasting only a short time, and accidental, meaning unexpected") *with Broadwell Realty Services, Inc. v. Fidelity and Guaranty Co. of New York*, 218 N.J.Super. 516, 530–36, 528 A.2d 76, 83–86 (1987) (under New Jersey law, sudden and accidental is construed to mean unexpected, unintended, unforeseen, or fortuitous from the point of view of the insured).

New Jersey arrived at its interpretation of the pollution exclusion clause based in part upon its conclusion that its language is ambiguous and that such ambiguity should be resolved against the insurer. *See id.* at 536, 528 A.2d at 86.

2. These dates are in dispute, but do not affect our disposition of the choice of law issue.

and consistency in the selection of the applicable law.

*Id.*, 417 A.2d at 492.

With respect to the "significant relationship" exception to this rule, the court held that courts should compare

the significant relationship of each state with the parties and the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.

*Id.*, 417 A.2d at 493.[3]

We note that the *State Farm* court considered this general approach appropriate for both contract and tort cases.[4] *See id.* at 37, 417 A.2d at 492. Moreover, the court suggested that "governmental interest analysis," which had previously been applied in New Jersey tort cases, was subsumed within its "significant relationship" test.[5] *See id.* at 36, 43 n. 2, 417 A.2d at 492, 496 n. 2.

In *State Farm*, a national insurer issued an automobile policy to an Alabama resident. The insured Alabamian drove his car to New Jersey, where he had been temporarily stationed by the U.S. Marine Corps. While in New Jersey, the insured loaned the car to another individual, who, after refusing to return it when requested, was killed in an accident along with his passengers. The question before the court was the interpretation of a clause of the insurance contract which extended coverage to individuals operating the insured's car with his permission.

Finding that New Jersey's interest in the matter was insufficient to rebut the presumption that the law of the place of contracting controls, the court affirmed both lower courts which had applied Alabama law to determine that there was no coverage under this clause. *See id.* at 38, 417 A.2d at 493. In reaching this conclusion, the court noted that it was not clear whether coverage would have been extended under New Jersey decisional law. *See id.* at 40–41, 417 A.2d at 494–95. The court emphasized, however, that the relevant statutes of both states were virtually identical; and even considering the fact that Alabama's courts had adopted more restrictive and narrow interpretations than New Jersey, the court concluded that these differences were not fundamental enough to render the application of Alabama law "offensive or repugnant to [New Jersey] public policy." *Id.*

We note that the court did not indicate how its holding would have been influenced had it been clear that New Jersey law would have extended coverage in this case, creating a true conflict between the laws of

---

3. The court focused this "significant relationship" inquiry upon sections 6(2) and 188 of the Restatement. Section 6(2) lists the following factors for consideration:

  (a) the needs of the interstate and international systems,
  (b) the relevant policies of the forum,
  (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
  (d) the protection of justified expectations,
  (e) the basic policies underlying the particular field of law,
  (f) certainty, predictability and uniformity or result,
  (g) ease in the determination and application of the law to be applied.

Section 188 states in part that "the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

  (a) the place of contracting,
  (b) the place of negotiation of the contract,

  (c) the place of performance,
  (d) the location of the subject matter of the contract,
  (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."

4. In tort cases the court had previously abandoned the *lex loci delicti* approach and replaced it with a choice of law rule based upon governmental interest analysis. *See State Farm*, 84 N.J. at 36–37, 417 A.2d at 492.

5. Because of the malleability of the Restatement approach, we accept the possibility that a choice of law rule fashioned upon its laundry list of precepts may incorporate some of the principles associated with traditional governmental interest analysis. We note, however, that a choice of law rule based upon an initial presumption in favor of the *lex loci contractus* would be anathema to traditional governmental interest analysis. *See* E. Scoles and P. Hay, *Conflict of Laws* § 2.6, at 16–20 (1984).

the involved sovereigns. As it is, the court rested upon its conclusion that

> the difference in the insurance laws of each state as to the extent of coverage accorded to an insured's permittee does not implicate the fundamental public policy of these states. Both states recognize that persons are entitled to the benefits of liability insurance when injured in accidents in which the vehicle was being driven by one who had obtained the use of the vehicle with the consent or permission of the insured. While each state differs as to the duration and character of that permission or consent, the public policy of each state nevertheless seeks to achieve the same fundamental goals and objectives.

*Id.* at 42, 417 A.2d at 495.

Finally, the court held that New Jersey's interest in protecting its residents against "financially irresponsible motorists" did not mean that all policies operant in the state had to be interpreted under New Jersey law. *Id.* The court noted:

> Current state statutes do not reveal a legislative scheme to protect New Jersey residents by specifically imposing upon out-of-state, insured, and financially-responsible drivers, who are not otherwise directly subject to our mandatory insurance laws, the same or identical level of insurance liability protection required of New Jersey motorists.

*Id.* at 42–43, 417 A.2d at 495–96.

■ We take from *State Farm* the proposition that the presumption in favor of the place of contracting should ordinarily be rebutted only when a fundamental public policy difference is implicated by a sovereign's significant relationship with the parties and with the underlying issue involved. *State Farm* suggests that where parallel and comprehensive statutory systems exist in the states involved, and where "the public policy of each state nevertheless seeks to achieve the same fundamental goals and objectives," the fact that one of the states has adopted more or less restrictive rules, regulations, or interpretations of its laws would not ordinarily indicate a legitimate preference for the application of that state's law.

## B. *Choice of Law in Environmental Clean-up Cases*

We now turn to the application of the principles enunciated in *State Farm* to environmental coverage cases. In order to set the stage for this discussion, we pause to frame the position of the parties before us. Plaintiff argues that an overwhelming consensus of state and federal New Jersey courts faced with environmental coverage actions have chosen to apply the law of New Jersey to interpret pollution exclusion clauses in insurance contracts when the landfill is located in New Jersey, regardless of where the insurance contract was formed. According to plaintiff, New Jersey's interest in coverage questions involving New Jersey sites clearly outweighs Pennsylvania's legitimate *lex loci contractus* interests, which have been emphasized by defendant. The cases discussed below all seek to identify and weigh the respective interests involved.

The most recent pronouncement of the New Jersey courts on this subject comes from the Appellate Division of the Superior Court in *Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n Insurance Co.*, 254 N.J.Super. 43, 603 A.2d 61 (1992). In *Gilbert Spruance*, plaintiff, a Pennsylvania paint manufacturer, purchased general liability policies from defendant insurer. A coverage dispute arose after plaintiff was charged with generating hazardous wastes in Pennsylvania that were deposited in New Jersey landfills, and the court was faced with the same choice of law problem we confront here. Another appellate division court previously had held that New Jersey law should govern this issue when the waste producing facility is located within New Jersey. *See Johnson Matthey Inc. v. Pennsylvania Manufacturers' Ass'n Insurance Co.*, 250 N.J.Super. 51, 593 A.2d 367 (App.Div.1991). The *Gilbert Spruance* court extended that rule to include out-of-state facilities that generate toxic wastes "that predictably come to rest in New Jersey...." *Gilbert*

*Spruance,* 254 N.J.Super. at 51, 603 A.2d at 65.

In reaching this conclusion, the court relied upon the reasoning of the *Johnson Matthey* court, which had found that:

1) New Jersey had a paramount interest in the remediation of New Jersey toxic waste sites, and in the fair compensation of victims of New Jersey pollution, and since financial resources for those purposes are of significance, New Jersey's urgent concern for the health and safety of its citizens therefore 'extends to assuring that casualty insurance companies fairly recognize the legal liabilities of their insureds' ...

2) the state of contracting can be an artificial and arbitrary designation; and that the interest of Pennsylvania, as the state of contracting was remote. It had no interest in preventing fair and predictable application of New Jersey law to Pennsylvania insurance contracts covering New Jersey risks. If it had an interest in uniformity of interpretation of Pennsylvania insurance contracts in other states, that goal was ... illusory, and secondary to New Jersey's paramount interest in the health and safety of its people. Finally ... that the insurers were fully aware that they were issuing policies to cover New Jersey risks whose liabilities were measured by New Jersey law.

*Gilbert Spruance,* 254 N.J.Super. at 47, 603 A.2d at 63 (*quoting Johnson Matthey,* 250 N.J.Super. at 57, 593 A.2d at 370).

In identifying the superior clean-up site-specific interests of New Jersey, the *Gilbert Spruance* court also relied upon the opinion of Judge Brotman, of our court, in *Leksi, Inc. v. Federal Insurance Co.,* 736 F.Supp. 1331 (D.N.J.1990). *See Gilbert Spruance,* 254 N.J.Super. at 48, 603 A.2d at 64. In *Leksi,* on facts similar both to those found in *Gilbert Spruance* and in the

case *sub judice,* Judge Brotman rejected the insurer's argument that although New Jersey has an overriding interest in seeing that the clean-up is accomplished, it does not have such an interest in determining who will pay for the clean-up. Judge Brotman stated that it was

difficult to imagine any interest that New Jersey could have that would be more compelling or, in the language of *State Farm,* more 'dominant and significant,' than its interest in determining the availability of funds for the cleanup of hazardous substances located within its borders.

*Id.* at 1335. Thus, he concluded that "[a] corollary to New Jersey's compelling interest in the remediation of hazardous waste sites is its interest in the availability of insurance coverage for the costs associated with the cleanup of those sites." [6] *Id.*

Insurers argue that displacing the law of the place of contracting thwarts the justified expectations of the contracting parties. However, the *Gilbert Spruance* court agreed with Judge Brotman's conclusion that it is foreseeable that toxic wastes from an abutting state will land in New Jersey, and that it is therefore foreseeable that the law of New Jersey will be applied to resolve coverage disputes.[7] *See Leksi,* 736 F.Supp. at 1336; *Gilbert Spruance,* 254 N.J.Super. at 48, 603 A.2d at 64.

Finally, the *Gilbert Spruance* court addressed the problem created by the site-specific approach where a set of general liability insurance policies issued to an insured facing liability in many states might be interpreted differently in the different involved states. One sister superior court in New Jersey, in *dictum,* indicated that in the interest of uniformity, the expectations of the parties, as well as "the common understanding of the commercial community," the law of only one state, the state of

---

**6.** Judge Brotman also noted that "[i]f there are no funds to satisfy the costs incurred in the cleanup of hazardous waste sites, the entire statutory framework would, in some cases, become a right without a remedy." *Leksi,* 736 F.Supp. at 1335.

**7.** The *Gilbert Spruance* court noted that when an insured operates in the multi-state arena, "the significance of the principal location of the insured risk diminishes, and it becomes easier to identify a state having a more significant relationship with respect to a particular issue." 254 N.J.Super. at 50, 603 A.2d at 65.

contracting, should be applied in such cases. *Westinghouse Electric Corp. v. Liberty Mutual Insurance Co.*, 233 N.J.Super. 463, 475–76, 559 A.2d 435, 441–42 (App.Div.1989).[8] *See also National Starch and Chemical Corp. v. Great American Insurance Cos.*, 743 F.Supp. 318, 323 (D.N.J.1990) (Ackerman, J.) (noting that the reasoning of *Westinghouse* is "based upon considerations of judicial economy, uniformity and certainty in the law, as well as deterrence of forum shopping").

Instead, following *Johnson Matthey*, the *Gilbert Spruance* court concluded that "nationwide uniformity of policy interpretation was an illusory goal, not truly achievable or necessarily preferable,"[9] and that parties were free to realize such uniformity by inserting choice of law provisions in their insurance contracts. 254 N.J.Super. at 49, 603 A.2d at 64. Having failed to insert such provisions, the court concluded that the parties must not have expected such uniformity in the first place. *See id.* 254 N.J.Super. at 49, 603 A.2d at 65. As articulated by the *Johnson Matthey* court, "the hypothetical Pennsylvania insurance policy, despite uniform policy language, expands and contracts to afford adequate coverage to its insured under the substan-

tive law of each state." *Johnson Matthey*, 250 N.J.Super. at 58, 593 A.2d at 371.

In *Leksi*, Judge Brotman concluded that New Jersey law should be applied based upon the factors outlined in Restatement section 6(2). In consideration of the needs of interstate commerce, Judge Brotman noted that

> [i]f a manufacturer from a neighboring state were free to place toxic waste in the host state without fear of subjecting itself to liability under the laws of the host state, it is likely that interstate transportation of hazardous wastes would produce litigation and conflict among states.... Common sense indicates that a state will be less willing to allow toxic wastes to be placed on its land unless it can be assured that its law will be applied in determining the respective liabilities of the parties for cleanup costs.

*Leksi*, 736 F.Supp. at 1334.

With respect to New Jersey's interests, Judge Brotman pointed out that "[s]everal statutes evince New Jersey's overriding interest in seeing to the cleanup of toxic wastes located within its boundaries." *Id.* He also found that Pennsylvania's interest in the insurance contract "pale[d] in comparison to that of New Jersey." *Id.* Ac-

---

**8.** The court stated:

> [W]e ... cannot conceive that the operative contract language in a single set of insurance policies issued by a group of insurers for the purpose of providing integrated comprehensive coverage for nationwide risks could mean something different in every state of the union ... [W]hen comprehensive nationwide coverage is purchased, it is surely the expectation of both insured and insurer that what the insured has bought and the insurer has sold is a single protection from liability irrespective of the particular state law under which that liability is determined so long as the risk, whether or not ultimately resulting in liability, is within the policy coverage....
> [T]he notion that the insured's rights under a single policy vary from state to state depending on the state in which the claim invoking the coverage arose contradicts not only the reasonable expectations of the parties but also the common understanding of the commercial community. It also seems to us anomalous, in conflict-of-law terms, to suggest that more than one body of law will apply to a single contract.

*Westinghouse*, 233 N.J.Super. at 475–76, 559 A.2d at 441–42 (citations omitted).

**9.** In fact, the *Johnson Matthey* court turned this argument on its head and stated that Pennsylvania "has no legitimate interest ... in preventing the fair and predictable application of foreign law to Pennsylvania insurance contracts which are written to cover insureds' liabilities in other states. *Johnson Matthey*, 250 N.J.Super. at 58, 593 A.2d at 371. The court also stated: "It may seem counterintuitive to ascribe to the same policy language one meaning on the east bank of the Delaware and another on the west bank. That is not, however, a consideration, unless uniform interpretation has sufficient value to overcome the significant governmental interest of the various jurisdictions where the insured risks are located, or where the insured entity predictably is going to incur legal liabilities. In our view, it does not." *Id.* at 58–59, 593 A.2d at 371. *See also NL Industries, Inc. v. Commercial Union Insurance Co.*, Civ. Nos. 90–2124, 90–2125, slip op. at 12, 1991 WL 398678 (D.N.J. July 11, 1991) ("a general, abstract need for certainty and uniformity does not constitute a contact or significant relationship").

cordingly, he held that "the state where the toxic waste comes to rest is the state whose law will apply, provided that it was reasonably foreseeable that the waste would come to rest there." *Id.* at 1336.

In *National Starch and Chemical Corp. v. Great American Insurance Cos.*, 743 F.Supp. 318, 323 (D.N.J.1990), Judge Ackerman was faced with a case in which toxic waste sites were located in many states. In deference to the notion that the reasonable expectations of parties should control, he rejected the site-specific approach and followed *Westinghouse's dictum*, holding that only one body of law should be applied in interpreting the insurance contracts. *See id.* at 322–23. In deciding whether the law of New Jersey, where, among other things, the manufacturing facility of the insured and where some of the waste sites were located, or the law of New York, the place of contracting, should be applied, Judge Ackerman decided in favor of New Jersey law. He did so by weighing the "significant relationship" factors of *State Farm*, noting that the insurer was in business in New Jersey; the insured had substantial contacts with New Jersey; and more of the relevant sites were located in New Jersey than in any other state, and only one was situated in New York. *See id.* at 326. Judge Ackerman thus concluded that the evidence suggested that the parties expectations pointed towards New Jersey, and, furthermore, following *Leksi,* that New Jersey's clean-up interests were paramount. *See id. See also NL Industries, Inc. v. Commercial Union Insurance Co.*, Civ. Nos. 90–2124, 90–2125, slip op. at 12–13 (D.N.J. July 11, 1991) (Sarokin, J.) (applying New Jersey law in deference to state's clean-up interests where there was no evidence of parties' expectations).

In *Armotek Industries v. Employers Insurance of Wausau*, 952 F.2d 756 (3d Cir. 1991), there was a Pennsylvania insurance contract; an insured Pennsylvania corporation operating out of New Jersey; and a clean-up site in Connecticut. In deciding between the application of New Jersey and Pennsylvania law—neither the parties nor the court considered applying Connecticut law—the court affirmed the district court's

decision that New Jersey's choice of law rule dictated that Pennsylvania law should apply, based largely upon the *lex locus contractus. See id.* at 760–762. In reaching this conclusion the court predicted that New Jersey's site-specific approach might not be followed when the site is located out of state. *See id.* at 759 n. 4.

### D. *Choice of Law in the Instant Matter*

■ We must "predict what the Supreme Court of New Jersey would decide if confronted by the same set of circumstances" as we face here. *Aetna Cas. & Sur. Co. v. Farrell*, 855 F.2d 146, 148 (3d Cir.1988). *See also Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 209, 76 S.Ct. 273, 279, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring). Of course, we look for guidance to opinions of intermediate state appellate courts and to our sister district courts. *See Threadgill v. Armstrong World Industries, Inc.*, 928 F.2d 1366, 1371 (3d Cir.1991); *White v. Johnson & Johnson Prod., Inc.*, 712 F.Supp. 33, 37 (D.N.J.1989).

Although there are disputes about some of the underlying facts, it appears to us that the *lex locus contractus* in this case is Pennsylvania. Enough transpired between the Pennsylvania offices of both parties to support this conclusion. Also, the competing interests of other involved states—such as Delaware or Massachusetts, where the parties maintain their principal places of business—in the contracts seem negligible by comparison. Additionally, although we believe that Delaware and Massachusetts have an interest in the controversy, New Jersey's interest appears paramount, primarily on the strength of the fact that the hazardous waste disposal sites in question are located there. Accordingly, following *State Farm*, we presume that Pennsylvania law should govern our determination "unless the dominant and significant relationship of [New Jersey] to the parties and the underlying issue dictates that this basic rule should yield." *State Farm Mutual Auto Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34–37, 417 A.2d 488, 491–93 (1980).

We believe that the conflict of laws before us reflects fundamental policy differences between New Jersey and Pennsylvania. The extent to which courts in New Jersey have interpreted pollution exclusion clauses to ensure insurance company liability in environmental clean-ups, to us, reflects policy differences that move beyond *State Farm's* admonition that where "the public policy of each state nevertheless seeks to achieve the same fundamental goals and objectives," the fact that one of the states has adopted more or less restrictive rules, regulations, or interpretations of its laws would not ordinarily indicate a legitimate preference for the application of that state's law. *Id.* at 42, 417 A.2d at 495. Although we recognize the problems associated with concluding that a legislative scheme reveals an intent to apply state law [10] to out-of-state insurance contracts whenever a New Jersey hazardous waste site is involved, at least a judge-made choice of law rule so concluding appears reasonable and consistent with New Jersey's comprehensive environmental laws.[11]

Moreover, the case law forcefully asserts New Jersey's "most significant relationship" and paramount government interests when the clean-up site is located within the state. Although there is merit to the objection that New Jersey's interest should be limited to ensuring that the site is cleaned up and does not extend to who pays the bill, we are persuaded that the nexus between the two is substantial enough to warrant this extension, and that the Supreme Court of New Jersey would also so conclude.[12]

With respect to foreseeability and the expectations of the parties, we agree about the foreseeability of hazardous waste products generated in an abutting state landing in New Jersey. However, considering the fact that the insurance contracts at issue were executed long before the unthinkable liability invented by statutes such as CERCLA, the notion of honoring the expectations of the parties in these cases is a

**10.** *See generally* L. Brillmayer, *Interest Analysis and the Myth of Legislative Intent,* 78 Mich. L.Rev. 392 (1980).

**11.** As noted by Judge Brotman in *Leksi:*
Several statutes evince New Jersey's overriding interest in seeing to the cleanup of toxic wastes located within its boundaries. *See* The New Jersey Spill Compensation and Control Act, N.J.Stat.Ann. § 58:10–23.11 *et seq.;* The Solid Waste Management Act, N.J.Stat.Ann. § 13:1E–1 *et seq.;* The Sanitary Landfill Facility Closure and Contingency Fund Act, N.J.Stat.Ann. § 13:1E–100 *et seq.;* The Water Pollution Control Act, N.J.Stat. Ann. § 23:5–28 *et seq.* In passing the Solid Waste Management Act, the New Jersey legislature expressly found that "the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest; [and] that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection and disposal service or efficient utilization of such waste...." N.J.Stat.Ann. § 13.1E–2(a). *Accord* N.J.Stat.Ann. § 58:10–23.11a (the "Legislature intends by the passage of this act to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damages sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances ..."). In furtherance of insuring the cleanup of toxic wastes deposited in New Jersey, the New Jersey Department of Environmental Protection is authorized to order the correction of violations, and any person who does not comply with such orders is subject to civil penalties. N.J.Stat.Ann. § 13:1E–10; *id.* § 13:1E–9(c).
*Leksi,* 736 F.Supp. at 1334–35. *See also* N.J.Stat. Ann. § 58:10–23.11s, which provides:
Any claims for costs of cleanup, civil penalties or damages by the State, and any claim for damages by an injured person, may be brought directly against the bond, the insurer, or any other person providing evidence of financial responsibility.

**12.** We recognize that as between insureds and insurers, this appears to be a pro-insured stance. We assume that it is based upon the assumption that insurers may be in a better position to fund these very expensive clean-ups. Because the insurance policies involved were written well before the advent of such animals such as CERCLA liability, we assume that the parties never contemplated such risks and never provided for them. Accordingly, by placing the risk upon the insurer, it cannot be said that New Jersey's site-specific approach thwarts the justified expectations of the parties. We note that this pro-insured stance is neutral as between sovereigns and ensures that insurance funds will be available for those clean-ups in which it is impossible for a polluter to provide for the costs.

legal fiction. In any case, there is nothing in the record before us to indicate the expectations of the parties with respect to the insurance contracts at issue here.

Unfortunately, we do not find the Restatement helpful in evaluating these questions. The Restatement's laundry list of relevant factors appears to us to be intrinsically malleable and therefore overly susceptible to a result oriented approach. We believe that there are substantial relationships and significant government interests on both sides of the river. When a New Jersey clean-up site is involved, however, there is a resounding consensus among courts that New Jersey's interests predominate, and we predict that the New Jersey Supreme Court will likewise come to this conclusion. Perhaps when the environment itself is at stake, even when the only contact with a state is the disposal of hazardous wastes within its borders, it is fair to conclude that the relationship with that state is the most significant and predominates. Accordingly, we agree with those courts that have held that the basic rule in favor of the *lex locus contractus* must yield.

We recognize that our approach, as well as the approach of essentially every other New Jersey court that has squarely faced this question, has emphasized the governmental interests involved and subordinated *lex locus contractus* interests, such as protecting the expectations of the parties. As Liberty Mutual has suggested, this might be interpreted as adopting the approach of

the dissent in *State Farm*.[13] *See State Farm Mutual Auto Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 44–58, 417 A.2d 488, 496–505 (1980) (Pashman, J., dissenting). Based upon the strength of New Jersey's interests with respect to landfills located within the state, and the negligible expectations of the parties involved, we believe application of either the majority or dissenting approach in *State Farm* produces the same result.[14] In any case, we predict that if faced with the precise question before us here, the Supreme Court of New Jersey would adopt the approach of the *State Farm* dissent and abandon the presumption in favor of the *lex locus contractus*.[15]

█ Finally, we decline to accept plaintiff's invitation to rule that, in the interest of judicial economy, New Jersey law shall govern all issues in this matter. Considering the course we have predicted that the Supreme Court of New Jersey will follow in cases such as this, the governmental interests of involved sovereigns must be analyzed "on an issue-by issue basis." *Veazey v. Doremus*, 103 N.J. 244, 248, 510 A.2d 1187, 1189 (1986). *See also Johnson Matthey*, 250 N.J.Super. at 65, 593 A.2d at 374 ("Conflicts principles do not dictate that all legal issues presented by a single case should be decided under the laws of a single state. Indeed, the evaluation of significant relationships and governmental interests takes place issue by issue and can lead to the application of different bodies of law."); *Mueller v. Parke Davis*, 252

---

**13.** The *State Farm* court stated that its approach subsumed governmental interest analysis, and brought New Jersey choice of law rules in contract cases in line with those adopted in tort cases, where governmental interest analysis had been explicitly applied. Nevertheless, *State Farm's* retention of a presumption in favor of the *lex locus contractus* appears incompatible with modern governmental interest analysis, which would consider, but subordinate, *lex locus contractus* interests such as the expectations of the parties.

**14.** Liberty Mutual characterizes a state's interest in cleaning up its landfills as a tort interest and argues that tort interests have no place in the analysis of choice of law determinations in contract disputes. We disagree, and we note that

both the *State Farm* majority and the dissent appear to support this conclusion. *See State Farm*, 84 N.J. 43 n. 2, 48–49, 417 A.2d 496 n. 2, 499–500.

**15.** *State Farm* appears to hold that the presumption in favor of the law of the place of contracting may only be rebutted when the application of a foreign sovereign's law by New Jersey would defeat a fundamental public policy of New Jersey, or would, in some way, be offensive or repugnant to New Jersey public policy. *See State Farm*, 84 N.J. at 40–41, 417 A.2d at 494–95. As discussed in the dissent, under governmental interest analysis, there would be a lower threshold for the consideration of the governmental interests of New Jersey. *See id.* at 50, 417 A.2d at 500 (Pashman, J., dissenting).

804

N.J.Super. 347, 351, 599 A.2d 950, 952 (App.Div.1991); R. Leflar, *American Conflicts Law* § 92, at 185 (3d ed.1977); R. Weintraub, *Commentary on the Conflict of Laws* § 6.9, at 285 (2d ed. 1980). Thus, our decision will be limited to the law to be applied to the pollution exclusion clause of the insurance contracts at issue here.

ORDER

This matter having come before the court on plaintiff's motion filed pursuant to 28 U.S.C. § 2201 for a declaratory judgment that the court will apply New Jersey law to interpret the pollution exclusion clause of the insurance contracts at issue; and the court having considered the submissions of the parties, and heard oral argument; and for good cause shown;

It is, on this 26th day of June, 1992, hereby ORDERED that plaintiff's motion is GRANTED and New Jersey law shall so be applied.